[No. G028000. Fourth Dist., Div. Three. Aug. 8, 2002.]

ANNOD CORPORATION, as Trustee, etc., Plaintiff and Appellant, v. HAMILTON & SAMUELS et al., Defendants and Respondents.

## COUNSEL

Cook, Perkiss & Lew, David J. Cook; Aires Raynsford, Timothy Carl Aires and Rick L. Raynsford for Plaintiff and Appellant.

Paul R. Hamilton, in pro. per.; Borchard & Willoughby and Mark Anthony Rodriguez for Defendants and Respondents Hamilton & Samuels, Paul R. Hamilton, Herbert N. Samuels, Inc., and William L. Steel.

Marc A. Zimmerman; Cox, Castle & Nicholson and Deborah M. Rosenthal for Defendant and Respondent Karen J. Lee.

Morrison & Foerster and Karen J. Lee for Defendant and Respondent Philip W. Green.

Green & Adams and Philip W. Green for Defendant and Respondent Deborah Rosenthal.

Green & Adams and Mark S. Adams for Defendant and Respondent Frederick H. Kranz.

Frederick H. Kranz; Cox, Castle & Nicholson and Frederick H. Kranz for Defendant and Respondent Mark S. Adams.

## OPINION

**MOORE, J.**—Plaintiff landlord sued the individual partners in a defunct law firm for rent due and owing under a commercial lease. The landlord sought damages for fraudulent conveyance, asserting the partners had drained the law firm of its assets by taking partnership draws instead of paying rent. The partners collectively filed three motions for summary judgment, each of which was granted.[1] The landlord appeals from the subsequently entered summary judgment in favor of the partners. It contends summary judgment was improper because there were triable issues of material fact as to whether the monetary transfers were made in good faith and for reasonably equivalent value. We disagree and affirm.

I

FACTS

The Hamilton & Samuels law firm, a general partnership, leased office space in Newport Beach from Annod Corporation, as trustee of the Bayview Trust (Annod).[2] The law firm ran into financial trouble and stopped making lease payments in September 1995. In November 1995, Annod filed suit against the law firm, in *Annod Corp. v. Hamilton & Samuels*, Orange County Superior Court, case No. 755182. Hamilton & Samuels dissolved in January 1996. In 1997, Annod obtained a judgment against Hamilton & Samuels in the amount of $839,971.49, but it never obtained payment on the judgment.

In 1999, Annod filed a complaint for avoidance of fraudulent transfers and damages for conspiracy to defraud creditors, against the Hamilton & Samuels partners. Annod accused the individual partners of transferring the assets of the firm with the intent to defraud Annod. As Annod would later explain, it viewed the draws the partners received during the period of time the law firm had stopped paying rent as fraudulent transfers. It asserted that the partners should not have received any draws during that time period, but should have used any funds available for draws to pay the rent instead. Annod sought return of the partnership draws taken between August 1995 and February 1996. The amount in controversy was roughly $400,000.

---

[1] In May 2000, the landlord filed three writ petitions (case Nos. G027316, G027333, and G027341) by which it challenged the three orders granting the motions for summary judgment. All three petitions were denied.

[2] Annod is successor-in-interest to the original landlord under the lease.

The individual law partners, in three groupings, collectively filed three motions for summary judgment.[3] In each of the three motions, the partners argued, inter alia, the lease was a nonrecourse lease as to them individually, and they had a defense to Annod's claims because the draws were made in good faith and for reasonably equivalent value. The trial court granted all three motions and entered judgment on behalf of all moving parties.

Annod filed an appeal from the judgment. It filed a second appeal from a subsequent order granting a motion for attorney fees as costs and a motion to be declared the prevailing party and fixing attorney fees.

## II

### DISCUSSION

#### A. *Standard of Review*

■ On review of a summary judgment, we "examine the record de novo and independently determine whether [the] decision is correct. [Citation.]" (*Colarossi v. Coty US Inc.* (2002) 97 Cal.App.4th 1142, 1149 [119 Cal.Rptr.2d 131].) In undertaking our independent review of the evidence submitted, we apply " 'the same three-step process required of the trial court: First, we identify the issues raised by the pleadings, since it is these allegations to which the motion must respond; secondly, we determine whether the moving party's showing has established facts which negate the opponent's claims and justify a judgment in movant's favor; when a summary judgment motion prima facie justifies a judgment, the third and final step is to determine whether the opposition demonstrates the existence of a triable, material factual issue. [Citations.]' " (*Waschek v. Department of Motor Vehicles* (1997) 59 Cal.App.4th 640, 644 [69 Cal.Rptr.2d 296].)

#### B. *Summary Judgment*

■ "The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute. [Citation.]" (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 [107 Cal.Rptr.2d 841, 24 P.3d 493].) "Under summary judgment law, any party to an action, whether plaintiff or defendant, 'may move' the court

---

[3]Partners Mark S. Adams and Frederick H. Kranz jointly filed one motion for summary judgment (the Adams Motion). Partners Philip W. Green, Deborah M. Rosenthal and Karen J. Lee filed the second motion for summary judgment (the Green Motion). Partners Paul R. Hamilton, Herbert N. Samuels, Inc., and William L. Steel, together with Hamilton & Samuels, jointly filed the third motion for summary judgment (the Hamilton Motion).

'for summary judgment' in his [or her] favor on a cause of action . . . or defense (Code Civ. Proc., § 437c, subd. (a))—a plaintiff 'contend[ing] . . . that there is no defense to the action,' a defendant 'contend[ing] that the action has no merit' (*ibid.*). The court must 'grant[]' the 'motion' 'if all the papers submitted show' that 'there is no triable issue as to any material fact' (*id.*, § 437c, subd. (c))—that is, there is no issue requiring a trial as to any fact that is necessary under the pleadings and, ultimately, the law [citations]—and that the 'moving party is entitled to a judgment as a matter of law' (Code Civ. Proc., § 437c, subd. (c))." (*Ibid.*)

■ "[I]n moving for summary judgment, a 'defendant . . . has met' his [or her] 'burden of showing that a cause of action has no merit if' he [or she] 'has shown that one or more elements of the cause of action . . . cannot be established, or that there is a complete defense to that cause of action. Once the defendant . . . has met that burden, the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto. . . .' (Code Civ. Proc., § 437c, subd. (o)(2).)" (*Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at p. 849.)

■ Just how a party moving for summary judgment carries his or her burden depends on the burden of proof at trial. In this case, Annod, at trial, would be required to show fraudulent intent by a preponderance of the evidence. (*Liodas v. Sahadi* (1977) 19 Cal.3d 278, 286-293 [137 Cal.Rptr. 635, 562 P.2d 316]; *Gagan v. Gouyd* (1999) 73 Cal.App.4th 835, 839 [86 Cal.Rptr.2d 733]; *Whitehouse v. Six Corp.* (1995) 40 Cal.App.4th 527, 533-534 [48 Cal.Rptr.2d 600]; but see *Reddy v. Gonzalez* (1992) 8 Cal.App.4th 118, 123 [10 Cal.Rptr.2d 55] [using clear and convincing evidence standard based on case disapproved in *Liodas*].) A defendant moving for summary judgment against a plaintiff who would bear the burden of proof by a preponderance of the evidence at trial "must present evidence that would require a reasonable trier of fact *not* to find any underlying material fact more likely than not . . . ." (*Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at p. 851.)

Accordingly, the moving partners were required to present evidence that would require the trial court *not* to find fraudulent intent more likely than not. In an effort to do so, they presented evidence to show good faith and reasonably equivalent value. Based on that evidence, the trial court held that the moving partners had established a complete defense to the fraudulent conveyance claim but that Annod had failed to show a triable issue of material fact existed as to that claim. As we shall show, we agree.

## C. Uniform Fraudulent Transfer Act

### (1) Civil Code section 3439 et seq.

■ As Annod points out, whether a conveyance is made with fraudulent intent is a question of fact. (*Bulmash v. Davis* (1979) 24 Cal.3d 691, 699 [157 Cal.Rptr. 66, 597 P.2d 469].) Annod asserts the trial court erred in determining there were no triable issues of material fact as to whether the partners acted in good faith and gave reasonably equivalent value, within the meaning of Civil Code section 3439.08, subdivision (a), and whether the draws were fraudulent transfers under Civil Code sections 3439.04 and/or 3439.05. We shall examine each of these provisions in turn.

The Uniform Fraudulent Transfer Act (the Act) is found in Civil Code section 3439 et seq. Section 3439.04 provides: "A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows: [¶] (a) With actual intent to hinder, delay, or defraud any creditor of the debtor. [¶] (b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: [¶] (1) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or [¶] (2) Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due." Section 3439.04 is construed to mean a transfer is fraudulent if the provisions of either subdivision (a) or subdivision (b) are satisfied. (*Monastra v. Konica Business Machines, U.S.A., Inc.* (1996) 43 Cal.App.4th 1628, 1635 [51 Cal.Rptr.2d 528]; *Reddy v. Gonzalez, supra,* 8 Cal.App.4th at pp. 122-123.)

Civil Code section 3439.08, subdivision (a) provides a defense to an action based on section 3439.04, subdivision (a). Section 3439.08, subdivision (a) states that "[a] transfer or an obligation is not voidable under subdivision (a) of Section 3439.04, against a person who took in good faith and for a reasonably equivalent value . . . ." Thus, a showing of good faith and reasonably equivalent value is all that is required to defeat a creditor's action based on section 3439.04, subdivision (a). Obviously, if a transfer is made both in good faith and for a reasonably equivalent value, then the transfer is not a fraudulent transfer under section 3439.04, subdivision (b), either, since subdivision (b) applies only to transfers made without receipt of reasonably equivalent value.

The same holds true with respect to Civil Code section 3439.05, which provides: "A transfer made or obligation incurred by a debtor is fraudulent

as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation." If the debtor received reasonably equivalent value, the inquiry ends there.

(2) *Evidence of good faith and reasonably equivalent value*

(a) *Trial court findings*

■ The trial court, in three lengthy orders granting summary judgment, explained why there was no triable issue of material fact as to either good faith or reasonably equivalent value. In the order on the Hamilton Motion, the court found: "On issue of good faith, the evidence is uncontradicted that the transferees acted without actual fraudulent intent and that they did not collude with the debtor; this is evidenced by the following: . . . (3) if the draws were not paid, none of the former partners would have continued working and generating revenue for the struggling law practice; (4) the draws [from August 1, 1995, forward] were for a substantially lesser amount than those taken for previous periods; (5) these partnership draws represent undermarket values for the services performed by the former partners; (6) the draws taken by the former partners, or alternatively, withdrawals from capital taken by the former partners were less than the income credited to each former partner's capital account in 1995 and 1996; and (7) the [lease] between the parties contained a provision . . . which provided that the former partners were not liable for the obligations of Hamilton & Samuels to Annod Corporation and that Annod Corporation would not resort to the personal assets of the former partners to satisfy the [lease] obligation . . . ."

In the order on the Hamilton Motion the court further found that "[a]s to the issue of . . . reasonably equivalent value, the evidence is uncontroverted that (1) the partnership draws resulted from legal work converted to billings undertaken by each of the former partners for the benefit of the partnership; (2) the draws received by the former partners [from August 1, 1995, forward] were considerably less than and paid on a much more sporadic basis than those which they had received promptly; (3) the draws were modest as compared to the remaining generated cash income of Hamilton & Samuels; and (4) the draws [from August 1, 1995, forward] were a fraction of what the former partners generated in receivables for Hamilton & Samuels."

In the orders on the Adams and Green Motions, the court was even more detailed in its findings. The orders detailed the amount of time each of the

moving partners billed in 1995, his or her billing rate, his or her total receivables that year, and the amount of compensation each of those partners actually received in draws in 1995. For example, in 1995, partner Frederick H. Kranz billed 1,675 hours at a billing rate of $285 per hour, which generated in excess of $480,000 in receivables. Yet he received only $92,144 in partnership draws for 1995. While not cited in the order itself, further evidence of the good faith nature of the draws was provided by Kranz in his declaration filed in support of the Adams Motion. In that declaration, Kranz declared that in the year after leaving Hamilton & Samuels his total compensation was nearly $400,000.

As the court further found in the order on the Green Motion, "[t]he evidence [was] overwhelming that the [moving partners] were not looting the firm . . . ." Rather, the evidence showed they "simply made the decision that in difficult times they would chose [sic] to pay creditors to whom they would bear individual liability, rather than a creditor who had agreed not to hold them personally liable." (See Civ. Code, § 3432 ["A debtor may pay one creditor in preference to another . . ."].)

In addition, the court found the moving partners "provided 'reasonably equivalent value' for the draws which they received by continuing to work substantial hours after [sic] H&S [Hamilton & Samuels] during the entire period from August 1995 through February 1996, by generating receivables in excess of the modest draws which they received and by leaving substantial assets, including cash income, in the firm which were then available to satisfy the claims of its creditors. The efforts of the [moving partners] during this period resulted in an increase in the amount of cash which was available to creditors over the amount which would have been available if they had ceased working on behalf of the firm in September 1995. Without the modest draws which they received during this period, the [moving partners] would have resigned immediately from H&S; the cash available to creditors of H&S would have been reduced as a result." Indeed, the record reflects that the partners made such an effort to increase funds available to creditors that at times Hamilton & Samuel employees, including some of the secretaries, were being paid more than the partners.

(b) *Timing of partnership draws*

Annod does not dispute the evidence supporting the trial court's findings. It does, however, complain about the timing of the partners' draws, implying the timing shows fraudulent intent. Annod states that the partners were not paid with respect to work performed in the immediately preceding pay period. Rather, it claims that, after payment of rent to Annod had ceased, the

partners received accrued but previously undisbursed draws relating to prior pay periods.

To the extent it is true that the partners were receiving delayed draws, this does not mean the monetary transfers were fraudulent. The statutory scheme does not treat delayed payments as suspect. To the contrary, Civil Code section 3439.03 provides that: "Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied . . . ." In this case, money was transferred in satisfaction of the antecedent debts of Hamilton & Samuels, i.e., the overdue partnership draws. These were transfers for value under section 3439.03.

Annod also complains that partner Paul Hamilton received just over $60,000 in draws in August 1995, right before Hamilton & Samuels quit paying rent. However, as Hamilton explained in his declaration in support of the Hamilton Motion, this sum was largely to bring current his overdue draws for the first half of 1995. As Hamilton explained, "Long before H&S defaulted on its rental obligation in September 1995, draws distributed to the partners had been severely reduced. By the end of July 1995, draws that ordinarily would have been disbursed at full rate for earlier time periods were being parsed out at one-half draw at a time, representing fifty percent (50%) of the current draw entitlement set earlier in the year." As he further stated, his draws were short "approximately $58,000 for the first seven months of 1995. In August 1995, certain long outstanding accounts receivable were paid to H&S, which permitted [him] to be paid approximately $60,592, . . . which cured the default in [his] draw payments for the period January 1, 1995 to July 31, 1995 . . . ."

(c) *Further evidence of good faith and reasonably equivalent value*

Hamilton's declaration also provides support for the trial court's finding that the partner draws were modest and a fraction of the receivables the respective partners generated. Hamilton declared that in 1995, he billed 2,120.75 hours, at a billing rate between $325 and $350 per hour. However, for the entire year he received $258,206. He remained on the leased premises for the first three months of 1996 as a liquidating partner and billed at least 150 hours per month, at an hourly rate of between $325 and $350. His billed time aggregated no less than $150,000 for that time period. But he received no more than $35,000 in draws in 1996. Finally, Hamilton declared that "[t]he draws [he] received in 1995, and in 1996 were over $200,000 less than draws and distributions which [he] had received in 1994, and over $300,000 less than draws and distributions [he] received in 1991, 1992 and 1993."

#### (d) *Badges of fraud*

 In an effort to muster some evidence of fraudulent intent, however, Annod refers to a Legislative Committee comment to Civil Code section 3439.04, to the effect certain "badges of fraud" are "evidence from which an inference of fraudulent intent may be drawn." (Legis. Com. com., 12A West's Ann. Civ. Code (1997 ed.) foll. § 3439.04, p. 289.) Annod argues fraudulent intent should be inferred because of the presence of at least three "badges of fraud," i.e., the challenged monetary transfers were to insiders (partners of a general partnership), Hamilton & Samuels was the target of actual and/or potential lease litigation at the time, and Hamilton & Samuels was insolvent. (See *ibid.* [badges of fraud include transfers to insiders, and transfers made when litigation is threatened or the transferor is insolvent].)

 As California courts have previously reminded litigants, the Legislative Committee comments concerning "badges of fraud" are not part of the statute. (*Lyons v. Security Pacific Nat. Bank* (1995) 40 Cal.App.4th 1001, 1021 [48 Cal.Rptr.2d 174]; *Wyzard v. Goller* (1994) 23 Cal.App.4th 1183, 1191 [28 Cal.Rptr.2d 608].) As the court in *Wyzard* explained, the Uniform Fraudulent Conveyance Act, on which the Act is based, "lists 11 such 'badges' which may be considered in deciding whether there was actual intent to hinder, delay or defraud. The California statute did not enact the 'badges of fraud' provision, although a legislative committee that considered the bill through which the . . . Act was enacted noted them and stated that the presence of one or more of them does not create a presumption of fraud . . . .' [Citation.]" (*Wyzard v. Goller, supra,* 23 Cal.App.4th at pp. 1188-1189, 1191, fn. omitted.) Furthermore, the Legislative Committee comment in question provides that in considering the enumerated "badges of fraud," the "court should evaluate all the relevant circumstances involving a challenged transfer" and "may appropriately take into account all indicia negativing as well as those suggesting fraud . . . ." (Legis. Com. com., 12A West's Ann. Civ. Code, *supra,* foll. § 3439.04, p. 290.)

 Annod's request for the court to make inferences is understandable considering that, in the fraudulent conveyance context, "[p]roof of fraudulent intent often consists of '*inferences* from the circumstances surrounding the transaction . . . .' [Citation.]" (*Eddy v. Temkin* (1985) 167 Cal.App.3d 1115, 1122 [213 Cal.Rptr. 597].) Moreover, in ruling on a summary judgment motion, "the court must 'consider all of the evidence' and 'all' of the 'inferences' reasonably drawn therefrom [citations] . . . ." (*Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at p. 843; Code Civ. Proc., § 437c, subd. (c).) At the same time, " '[w]hen opposition to a motion for summary judgment is based on inferences, those inferences must be reasonably deducible from the evidence, and not such as are derived from speculation,

conjecture, imagination, or guesswork.' [Citation.]" (*Waschek v. Department of Motor Vehicles, supra,* 59 Cal.App.4th at p. 647.) In this case, Annod presents nothing but speculation. "Speculation, however, is not evidence." (*Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at p. 864.)

██ Here, the trial court had before it not only the proferred "badges of fraud," but also evidence negativing any inference of fraud. Even the existence of several "badges of fraud" may be insufficient to raise a triable issue of material fact. (*Wyzard v. Goller, supra,* 23 Cal.App.4th at p. 1191.) (See also *In re Cohen* (Bankr. 9th Cir. 1996) 199 B.R. 709, 719 [summary judgment is not precluded if the conflict in the evidence "is not of sufficient magnitude to create a *genuine* issue of material fact"; summary judgment is proper when the party opposing the summary judgment does not provide "evidence that would permit a rational trier of fact to conclude . . . [the debtor] was cheating his creditors"].) We cannot say the trial court erred in concluding Annod's inferences did not raise a triable issue of material fact.

(3) *Insider distributions*

██ Annod argues there was a triable issue of material fact as to good faith because "an insider can never receive a fraudulent transfer in good faith . . . ." More particularly, Annod asserts that the good faith defense is not available because the partners were all insiders of Hamilton & Samuels and had actual notice of the lease obligation at the time they took the cash draws.

The Legislative Committee comment to Civil Code section 3439.08, subdivision (a), provides that "good faith," within the meaning of the provision, "means that the transferee acted without actual fraudulent intent and that he or she did not collude with the debtor or otherwise actively participate in the fraudulent scheme of the debtor. The transferee's knowledge of the transferor's fraudulent intent may, in combination with other facts, be relevant on the issue of the transferee's good faith . . . ." (Legis. Com. com., 12A West's Ann. Civ. Code, *supra,* foll. § 3439.08, p. 359.) Annod believes that as long as the partners had knowledge of the overdue lease payments, they cannot have taken draws in good faith.

This is reading too much into the good faith requirement, however. As stated in *Lewis v. Superior Court* (1994) 30 Cal.App.4th 1850, 1858-1859 [37 Cal.Rptr.2d 63], with reference to the Legislative Committee comments, " '[f]raudulent intent,' 'collusion,' 'active participation,' 'fraudulent scheme'—this is the language of *deliberate wrongful conduct.*" Annod cites no authority for the proposition that accepting partnership compensation with the knowledge that lease payments are overdue is tantamount to the

participation in a fraudulent scheme. Similarly, Annod cites no authority to the effect that a partner is prohibited from receiving a partnership draw authorized by the relevant partnership documents if the partnership cannot make its rental payments.

### (4) Ruling on fraudulent intent

Wrapping up its arguments on fraudulent intent, Annod also argues the trial court erred by failing to address whether the partners engaged in fraudulent transfers. Clearly, the court did not fail to address the matter. It not only found the partners had acted in good faith, it specifically found the uncontradicted evidence showed the partners had acted without fraudulent intent.

### (5) Nonrecourse lease

Underlying Annod's fraudulent intent arguments is an obvious complaint that it was simply unfair and inappropriate for the partners to receive partnership draws while failing to pay their rent. This is a moral issue we need not decide. Besides, it is a risk Annod knowingly accepted as part and parcel of the lease agreement. The lease contained reciprocal waivers. The landlord agreed not to "seek recourse against the individual partners, directors, officers or shareholders of [the tenant] or any of their personal asserts for satisfaction of any liability with respect to [the lease]" and the tenant agreed not to "seek recourse against the individual partners, directors, officers or shareholder[s] of [the landlord] or any of their personal asserts for satisfaction of any liability with respect to [the lease]." The lease provided a bargained-for two-way release of liability. Applied in retrospect, it may have been a bad deal for the landlord, but that was the risk the landlord took and we will not rewrite the lease to delete the nonrecourse provision.

Annod argues that the nonrecourse provision does not preclude recovery against the partners because it does not bar an action for fraudulent conveyance. As Annod points out, a fraudulent conveyance is void as against the transferor's creditors and title remains in the transferor as if no conveyance had been attempted. (*Nicolos v. Grover* (1986) 186 Cal.App.3d 858, 861 [231 Cal.Rptr. 79].) While we agree the nonrecourse provision does not bar a fraudulent conveyance cause of action, in the end, the fraudulent conveyance must be shown. Very simply put, Annod failed to raise a triable issue of material fact as to good faith or the receipt of reasonably equivalent value.

### (6) Reasonably equivalent value of partner services

Annod disagrees. It maintains there was a triable issue of material fact as to whether the partners gave reasonably equivalent value because "a partner

of a general partnership can never give reasonably equivalent value by merely performing services in furtherance of the partnership's business." Annod contends that under general partnership law, a partner is entitled to no compensation other than a share of the profits, in the absence of an agreement to the contrary. It explains that, unless an agreement otherwise provides, services are rendered in exchange for a share of the profits and a partner is entitled to no additional compensation with respect to the reasonable value of services rendered.

While Annod acknowledges the significance of agreements between partners as a general proposition, in its brief it fails to cite any portion of the Hamilton & Samuels partnership agreement and amendments thereto, which are contained in the record, to show what monies the partners whose case is before us were entitled to receive. Annod's briefs cite no portion of the Hamilton & Samuels partnership agreement or amendments to show that, under the circumstances, partnership draws were not permitted or the partners were not entitled to compensation from the partnership for the legal work they performed.

In its opening brief, Annod, without citation to the record, makes the bald assertion that "[t]here is nothing in the H&S Partnership Agreement which guarantees the payment of salary or wages to any of the Partners." Annod continues, "[t]hus, even amongst themselves as equity-holders, each understood that compensation would only come from profit-sharing." ▉ Since this argument is made without citation to the record, it is deemed waived. (*Guthrey v. State of California* (1998) 63 Cal.App.4th 1108, 1115 [75 Cal.Rptr.2d 27].) We are not required to do an unassisted review of the record and the partnership documents contained therein to ascertain whether partnership draws, contrary to the trial court's determination, were inappropriate under the circumstances. (*Ibid.*)

At oral argument, Annod cited to certain portions of paragraph 12 on page 9 of the partnership agreement, for the proposition the partners were not entitled to any draws because there were no net profits. Assuming there were indeed no net profits, paragraph 12 of the partnership agreement nonetheless did not support Annod's assertion. Paragraph 12 provided definitions of net profits and net losses and explained how they would be allocated to the respective partners. It was a method of establishing in what proportions the partners, as between themselves, would share in the profits and losses of the firm. It did not, however, provide that no partner could receive a draw if there were no net profits at any given point in time or any bills remained unpaid.

Paragraph 12 of the partnership agreement provided a committee would set the respective partner draws within the first three months of each fiscal

year. The amounts of the draws were to be based on the results of operation for the prior fiscal year, the expected results of operation for the fiscal year for which draws were being set, the requirements of operating capital and the partners' respective interests in the firm. It did not state that draws would be reduced later in the year if there were unpaid bills or that draws would be halted if there were net losses at any given moment in time. The provision did permit the committee, in its discretion, to change the amount of the draws from time to time, but did not require the committee to do so.

In the order granting the Green Motion, the court specifically found that the moving partners' conduct in taking draws and making withdrawals from their capital accounts was "consistent with the Partnership Agreement." In the order granting the Adams Motion, the court found "[t]he individual partners had no obligation under the partnership agreement . . . to refrain from receiving compensation" under the circumstances. Annod cites no provision of the partnership agreement showing the trial court's interpretation of the document is incorrect.

### (7) *Conclusion*

In its complaint, Annod asserted the partners had engaged in fraudulent conveyances. In their motions for summary judgment, the partners established a complete defense by showing the transfers were made in good faith and for reasonably equivalent value. In other words, they presented evidence that would require the trial court *not* to find fraudulent intent more likely than not. Annod failed to demonstrate the existence of a triable issue of material fact as to the partners' defense. Consequently, the trial court properly granted summary judgment.

Having concluded, based on the issues discussed in this opinion, that the court properly granted summary judgment, we need not address the additional defenses the partners raised, including the defenses applicable only to Adams and Kranz—the two partners who withdrew from the partnership in August and September 1995, respectively, and took no part in the law firm's decision to cease paying rent.

### D. *Appeal of Order Granting Postjudgment Motions*

While Annod filed two notices of appeal, in its opening brief it only addressed one—the appeal from the judgment. It failed to brief the appeal from the postjudgment order pertaining to attorney fees and costs. In its reply brief, Annod concedes that it does not challenge the decision of the trial court on the amount of attorney fees. Rather, it merely asserts that the

award of attorney fees and costs "will fall, if and when, the judgment is reversed." The judgment is not being reversed, so the court's order on attorney fees and costs stands.

E. *Motion to Strike*

Respondents Hamilton & Samuels, Paul R. Hamilton, Herbert N. Samuels, Inc., and William L. Steel filed a motion to strike the transcript of oral proceedings filed in conjunction with the opening brief and all references to the transcript in the opening brief. The motion made reference to a transcript of the oral proceedings held on April 6, 2000. However, because no reporter's transcript had been filed with this court in conjunction with the filing of Annod's opening brief, this court filed an order declaring the motion to be moot to the extent it sought the striking of the transcript. The order stated the motion, insofar as it requested the striking of any references to the reporter's transcript, as contained in Annod's opening brief, would be decided in conjunction with the decision on appeal. The motion is granted and references to the reporter's transcript, as contained in Annod's opening brief, are hereby stricken.

## III

### DISPOSITION

The judgment and postjudgment order are affirmed. The respondents shall recover their costs on appeal.

Sills, P. J., and O'Leary, J., concurred.

A petition for a rehearing was denied August 27, 2002, and appellant's petition for review by the Supreme Court was denied November 26, 2002.