Filed 11/13/14  In re Madison T. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re MADISON T., a Person Coming Under the Juvenile Court Law. | |
| | D066116 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. CJ1094) |
| v. | |
| KELLY S., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Cynthia Bashant, Judge.  Affirmed.

Neil R. Trop, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Lisa M. Maldonado, Deputy County Counsel, for Plaintiff and Respondent.

Kelly S. appeals a juvenile court judgment terminating her parental rights to her daughter, Madison T., and choosing adoption as the preferred permanent plan. (Welf. & Inst. Code, § 366.26.)[1] Kelly contends reversal is required because the court's placement of Madison with a relative in Victorville, California, between the time reunification services were terminated and the section 366.26 hearing was held, impeded visitation and deprived her of the ability to establish the beneficial parent-child relationship exception to the adoption preference. (§ 366.26, subd. (c)(1)(B)(i).) Kelly also contends reversal is required because of inadequacies in the assessment report by the San Diego County Health and Human Services Agency (the Agency). We affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

In September 2012, the Agency filed a petition on behalf seven-week-old Madison under section 300, subdivision (b). It alleged Kelly suffered from chronic paranoid schizophrenia and other mental health problems, and she was not receiving psychiatric care or taking medication; she had a history of methamphetamine use and she tested presumptively positive for marijuana when Madison was born; and Madison had been admitted to the hospital twice, once after she stopped breathing "due to apnea and cyanosis," and once for bronchitis, and during the second admission she was exposed to domestic violence between Kelly and her boyfriend. The Agency originally left Madison in Kelly's care, but by the time of the disposition and jurisdiction hearing it had placed her in the licensed foster home of Sheila W.

---

[1] All further undesignated statutory references are to the Welfare and Institutions Code.

2

This case has been the subject of two previous appeals, and given the limited issues here we need not repeat the entire history. Suffice it to say that Kelly was unsuccessful in her reunification attempts. At times, she told the social worker she did not want to reunify and Madison would be better off adopted.

At the July 30, 2013, six-month review hearing, the court followed the Agency's recommendation and terminated Kelly's reunification services, scheduled a section 366.26 hearing for November, and ordered that Madison be moved to the home of the paternal aunt, Suzanne T., in Victorville. Suzanne already had custody of Madison's younger half sister, K.T. The Agency approved Suzanne's home for placement and she wanted to adopt Madison if reunification was unsuccessful. The Agency was concerned about the distance, but Suzanne agreed to transport Madison to northern San Diego County for supervised visits on the weekend and that Kelly could have additional visits if she traveled to Victorville.[2]

Immediately before the review hearing, the court heard Kelly's petition under section 388 to move Madison from Sheila's home to the home of nonrelative extended family members S.B., the father and custodian of Kelly's older daughter, Kaylie B., and R.B., S.B.'s mother. The petition alleged "a number of concerns" had arisen regarding Sheila's care of Madison, and R.B. was "prepared to meet Madison's developmental

---

[2]    Initially, Suzanne agreed to drive Madison to Escondido. Kelly would take the bus from San Diego and meet Madison in Escondido. In late September 2013, Suzanne objected to the lengthy drive to Escondido, and Kelly agreed that visitation would take place in Temecula.

needs and is able to provide for Madison. . . . Placing Madison with [R.B.] would also allow Madison to continue the relationship with her sister Kaylie."

The Agency was concerned, however, because S.B. and R.B. appeared more concerned about Kelly's needs than Madison's needs, they did not set clear boundaries with Kelly, and there were prior referrals between Kelly and S.B. regarding drug use and domestic violence. The Agency believed placement with Suzanne was the best option as she "is able to set clear boundaries with the parents, she has a day[-]to[-]day plan for the care of Madison, . . . and [she] will coordinate visitation and phone calls [between] Madison and . . . Kaylie . . . to continue the bond Madison has with Kaylie."

The court denied the petition. It found changed circumstances since S.B. and R.B.'s home had recently been approved for placement, but a lack of evidence placement there would be in Madison's best interests.[3] Kelly appealed the order on the section 388 petition and this court affirmed it.

In November 2013, the court continued the section 366.26 hearing to February 2014 because of notice issues with the alleged father, Jason T.[4] Kelly asked that visits be moved back to Escondido because she was pregnant and could not travel very far. The

---

[3] The alleged issues pertaining to Sheila's care of Madison were mostly trifling. Attached to the section 388 petition were letters from R.B. and S.B. to the social worker criticizing such things as how Sheila dressed Madison, the use of disposable rather than cloth diapers, and the nonuse of bibs during feedings. S.B. criticized Sheila for having petroleum jelly in Madison's diaper bag, as he used an "all natural diaper rash cream" on his daughter. The court stated it was a "fan" of Sheila, explaining "[s]he has done a good job with a number of the court's dependent children."

[4] Jason is not involved in this appeal.

court, noting it had no information from a physician on any travel restriction, left the matter to the social worker's discretion.

In February 2014, Kelly produced a physician's note that stated: "Due to a medical condition, Kelly is not able to travel long distances (i.e.[,] Temecula)." The court ordered that visitation return to Escondido, and that Kelly confirm her attendance a few days before a scheduled visit. The court continued the section 366.26 hearing to April.

In March 2014, Kelly filed a second petition under section 388 regarding placement. She argued Madison should be moved from Suzanne's home to S.B. and R.B.'s home or, alternatively, back to Sheila's home. The petition alleged, "There has been much difficulty in facilitating visitation between Madison and her mother, resulting in the mother spending very limited time with her daughter . . . ." A portion of an Agency report was attached to the petition, which stated Kelly had visited Madison only two times since Madison's move to Victorville: September 22 and October 20, 2013. Kelly cancelled the August 11 visit, and August 18 and October 6 visits because of illness, and Suzanne cancelled the August 25 visit because of illness. Visits did not take place on August 31 or most of September because Kelly failed to confirm her attendance.

By the time of the March 24, 2014, pretrial status conference, Kelly had given birth to another daughter. The baby tested positive for marijuana and was removed from Kelly's custody. The court addressed Kelly's second section 388 petition. She withdrew her request that Madison be placed with S.B. and R.B., leaving Sheila as the sole option. Madison's counsel opposed a change in placement, explaining she was thriving at

5

Suzanne's and Kelly caused many of the missed visits. The court found Kelly did not make a prima facie showing to justify an evidentiary hearing on the petition, particularly because there was no input from Sheila that she was available or willing to care for Madison again.

On April 9, 2014, the section 366.26 hearing commenced. The Agency recommended termination of parental rights and adoption as the preferred permanent plan. In its assessment report, the Agency described Madison as specifically adoptable because Suzanne loves her and is committed to adopting her. It also described her as generally adoptable because she "is young, attractive, and healthy," and she was "progressing developmentally and is now walking and beginning to talk." Thirty approved adoptive families in San Diego County alone wanted a child with Madison's characteristics.

Kelly raised the beneficial parent-child relationship exception to the adoption preference. The Agency argued the exception did not apply, noting Kelly presented no evidence on the issue. The Agency advised the court that Kelly did not visit Madison between October 20 and December 22, 2013, "when she showed up after the visit had ended." She did not visit at all in January 2014, and she visited only once in February, even though that month visits were returned to Escondido at her request.

The Agency also advised: "When Kelly does visit Madison the child barely relates to her and she only relates to her in a very limited manner for a brief portion of the visits. Madison does not show excitement upon seeing her mother nor does she show any

6

emotion when she leaves. Any benefit that there might be of a future relationship with the mother does not outweigh the permanence and stability of an adoptive home."

Kelly conceded her visitation was sporadic. She argued, however, that the court should "consider the visitation . . . in the context of what was allowed" after Madison was moved to Victorville. She argued that she "struggled with finances, homelessness, . . . having stability on her own, and those [along with her pregnancy] were great obstacles in traveling the great distance to Escondido to see her child."

The court found by clear and convincing evidence that Madison was adoptable and none of the statutory exceptions to adoption applied. The court terminated all parental rights and found adoption was in her best interests.

DISCUSSION

I

*Location of Visitation*

Kelly contends the judgment must be reversed because Madison's placement in Victorville impeded visitation and precluded her from establishing the beneficial parent-child relationship exception to the adoption preference. We are unpersuaded.[5]

In a dependency action, visitation orders are subject to an abuse of discretion standard of review. (*In re Jennifer G.* (1990) 221 Cal.App.3d 752, 756-757.) " ' "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of

---

5   We disagree with the Agency's assertion Kelly's appeal is a challenge to the July 30, 2013, placement order, and is thus barred as untimely. She does not challenge the placement order per se, but contends its eventual effect on visitation precluded her from establishing the beneficial parent-child relationship exception to adoption.

reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.)

During the reunification period, the court should ordinarily order that visitation be "as frequent as possible, consistent with the well-being of the child." (§ 362.1, subd. (a)(1)(A).) The purpose of visitation during this period is to "maintain ties between the parent . . . and the child, and to provide information relevant to deciding if, and when, to return a child to the custody of his or her parent . . . ." (§ 362.1, subd. (a).) "[U]p until the time the section 366.26 hearing is set, the parent's interest in reunification is given precedence over the child's need for stability and permanency." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 310 (*Marilyn H.*).)

If the court terminates reunification services and sets a section 366.26 hearing, the court "shall continue to permit the parent . . . to visit the child pending the hearing unless it finds that visitation would be detrimental to the child." (§ 366.21, subd. (h); *In re David D.* (1994) 28 Cal.App.4th 941, 954.) However, at this stage the parent's interest in the care, custody and companionship of the child is no longer *paramount*. "Once reunification services are ordered terminated, the focus shifts to the needs of the child for permanency and stability." (*Marilyn H., supra,* 5 Cal.4th at p. 309.) "Visitation during the postreunification period . . . is governed by different statutes, which focus on permanency and stability for the child." (*In re D.B.* (2013) 217 Cal.App.4th 1080, 1090.)

At a section 366.26 hearing, the court must terminate parental rights and free the child for adoption if it determines by clear and convincing evidence the child is adoptable

within a reasonable time, and the parents have not shown that termination of parental rights would be detrimental to the child under any of the statutory exceptions to adoption found in section 366.26, subdivision (c)(1)(B)(i) through (vi).  (*In re Asia L.* (2003) 107 Cal.App.4th 498, 510.)  "[C]hildren have a fundamental independent interest in belonging to a family unit [citation], and they have compelling rights to be protected from abuse and neglect and to have a placement that is stable, permanent, and that allows the caretaker to make a full emotional commitment to the child."  (*Marilyn H., supra,* 5 Cal.4th at p. 306.)  "Adoption gives a child the best chance at a full emotional commitment from a responsible caretaker."  (*In re J.C.* (2014) 226 Cal.App.4th 503, 527.)

One of the exceptions to adoption applies if termination of parental rights would be detrimental to the child because the "parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i).)  Under the second prong, the court "balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer."  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)  "The exception must be examined on a case-by-case basis, taking into account the many variables which affect a parent/child bond," such as the child's age and the portion of his or her life spent in the parent's custody.  (*Id.* at pp. 575-576.)

Kelly ignores that when Madison was placed with Suzanne in Victorville, the focus had shifted to the child's needs.  As the Agency points out, by then "the issue before the court was what would promote and protect Madison's best interests, not how [Kelly]

9

could most conveniently exercise visitation."  " '[T]he fundamental premise of dependency law is to serve the best interests of the dependent child.' "  (*In re A.J.* (2013) 214 Cal.App.4th 525, 536.)  Kelly does not suggest the move to Victorville was inconsistent with Madison's best interests, or cite any evidence on the issue.  Thus, she has forfeited appellate review of the best interests issue.  (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785; *Annod Corp. v. Hamilton & Samuels* (2002) 100 Cal.App.4th 1286, 1301.)[6]

In any event, Kelly has not established any nexus between the location of visitation and her inability to establish the beneficial parent-child relationship exception. (§ 366.26, subd. (c)(1)(B)(i).)  The placement order was made on July 30, 2013.  She cancelled visits on August 11, and August 18 and October 6 because of illness.  Visits did not take place on August 31 or most of September because she did not confirm her attendance.  She did not visit between October 20 and December 22, 2013, "when she showed up after the visit had ended," and she did not visit at all in January 2014 because she did not confirm her attendance.  She points to no evidence she was unable to travel to

---

6    The opinions Kelly relies on are unavailing because they hold that services provided during the *reunification* period were unreasonable.  (*In re Dylan T.* (1998) 65 Cal.App.4th 765, 767, 769 [court ordered no visitation during parent's incarceration]; *In re Brittany S.* (1993) 17 Cal.App.4th 1399, 1407 [service plan did not include visitation for incarcerated parent]; *In re Precious J.* (1996) 42 Cal.App.4th 1463, 1467, 1476-1480 [service plan included visitation for incarcerated parent, but social services agency failed to facilitate it]; *In re Dino E.* (1992) 6 Cal.App.4th 1768, 1776-1777 [no service plan developed]; *In re Michael S.* (1987) 188 Cal.App.3d 1448, 1458-1460 [service plan not particularized to family's specific needs].)  Here, the adequacy of visitation during the reunification period is not at issue.

the visitation site during this time or that her failure to confirm her attendance was related to travel.

On February 5, 2014, Kelly produced a physician's note that stated she could not travel to Temecula, and thus the court granted her request that visitation take place in Escondido. She nonetheless visited Madison only once in February. She cancelled a visit on March 9, 2014, "because she thought she was having contractions." She cancelled a visit on March 23, because she was scheduled to have a C-section on March 20. She later called the social worker to say she could attend the March 23 visit, but she "called again and cancelled the visit due to having gone to the Crisis House." She cites no evidence showing these visits would have occurred had the location been different.

" ' " '[I]t is the appellant's responsibility to affirmatively demonstrate error . . . by citation to the record . . . .' " ' " (*Morgan v. Imperial Irrigation Dist.* (2014) 223 Cal.App.4th 892, 913; Cal. Rules of Court, rule 8.204(a)(1)(C).) We may disregard arguments unsupported by citation to the record. (*City of Santa Maria v. Adam* (2012) 211 Cal.App.4th 266, 287.) We presume issues unrelated to travel ensured Kelly could not satisfy the statutory exception. "The most fundamental rule of appellate review is that a judgment is presumed correct, all intendments and presumptions are indulged in its favor, and ambiguities are resolved in favor of affirmance." (*Id.* at p. 286; *In re Julian R.* (2009) 47 Cal.4th 487, 498-499.)

Further, we consider the visitation location in light of placement options, not in a vacuum. Kelly did not appeal the March 24, 2014, order denying her section 388 petition to modify the placement order by removing Madison from Suzanne's prospective

11

adoptive home and returning her to Sheila's foster home in San Diego, and thus she cannot (and does not) contend the order was in error. Where was Madison to live pending the section 366.26 hearing, if not with Suzanne? Elsewhere in her briefing, Kelly concedes Madison is so attached to Suzanne that she would suffer emotional trauma if separated from her. Kelly does not specify what the court could have done to move visitation closer to her. Under these circumstances, we cannot find abuse of discretion.

## II

### *Alleged Deficiencies of Assessment Report*

Additionally, Kelly challenges the sufficiency of the evidence to support the court's selection of adoptability as the permanent plan. Specifically, she asserts the Agency's assessment report was deficient in certain aspects.[7]

Again, the standard of proof at the juvenile court is clear and convincing evidence. (§ 366.26, subd. (c)(1).) " '[O]n appeal from a judgment required to be based upon clear and convincing evidence, "the clear and convincing test disappears . . . [and] the usual rule of conflicting evidence is applied, giving full effect to the respondent's evidence,

---

[7] The Agency contends Kelly forfeited appellate review by not objecting to the adequacy of the assessment report at the juvenile court. Kelly asserts forfeiture does not apply to her challenge to the sufficiency of the evidence to support the court's selection of adoption as the permanent plan. She submits: "It is the failure of the [Agency] to introduce the necessary evidence, in any form, whether via the assessment report, other documentary evidence or live testimony, that rendered the totality of the evidence legally insufficient to support the ultimate findings and orders of the court." We need not resolve the issue, because the result is the same regardless of whether forfeiture is applicable.

however slight, and disregarding the appellant's evidence, however strong." ' " (*In re Mark L.* (2001) 94 Cal.App.4th 573, 580-581.)  "The substantial evidence standard of review is generally considered the most difficult standard of review to meet, as it should be, because it is not the function of the reviewing court to determine the facts." (*In re Michael G.* (2012) 203 Cal.App.4th 580, 589.)

"Whenever a dependency case is referred for a selection and implementation hearing the court so ordering must require the agency supervising the child to prepare an 'assessment.' " (*In re Crystal J.* (1993) 12 Cal.App.4th 407, 411.)  The assessment shall include a "*preliminary* assessment of the eligibility and commitment of any identified prospective adoptive parent or legal guardian, . . . to include a social history including screening for criminal records and prior referrals for child abuse or neglect, the capability to meet the child's needs, and the understanding of the legal and financial rights and responsibilities of adoption and guardianship."  (§ 366.21, subd. (i)(1)(D), italics added.)

Kelly complains that the Agency's assessment report cursorily states Suzanne understands the responsibilities of adoption and her legal and financial rights.  Kelly asserts the "extent to which the prospective permanent caregiver possesses an understanding of this essential information is a conclusion that the trial judge is supposed to draw, not the social worker who authors the assessment report.  The trial judge, in independently making these determinations, must be informed what the attendant rights and obligations are; what information was presented to the prospective adoptive parent with regard to those rights and obligations; and the prospective adoptive parent's response, if any, to the presentation of that information."

13

Kelly cites no supporting authority, and we disagree. Because the assessment report states Suzanne understood these issues and wished to adopt, we presume the Agency adequately advised her. (Evid. Code, § 664 ["It is presumed that official duty has been regularly performed."]; *In re Dakota S.* (2000) 85 Cal.App.4th 494, 505.) Consequently, more detailed information was unnecessary. (*In re Dakota S.,* at p. 505.)

Additionally, Kelly makes the rather convoluted assertion that because Madison is so attached to Suzanne, the court should not have selected adoption as the permanent plan absent evidence her home had already been formally evaluated and approved. In Kelly's view, the ruling put Madison "at risk of experiencing the emotional trauma of being unnecessarily removed from Suzanne's home should Suzanne fail to qualify as an adoptive parent yet be eligible to remain Madison's caretaker under a permanent plan of guardianship or long[-]term foster care." Kelly cites the notation in the assessment report that states Suzanne had applied to adopt both Madison and K.T., and "there are no indications that her home will not be approved for the adoption of both children."

Kelly cites no supporting authority, and again, we disagree. The assessment must include only a "preliminary assessment" of eligibility to adopt. (§ 366.21, subd. (i)(1)(D).) The court's selection of adoption as the preferred plan is based on the *likelihood* of adoption, not on current placement in a prospective adoptive home. Indeed, "[t]he fact that the child is not yet placed in a preadoptive home nor with a relative or foster family who is prepared to adopt the child, shall *not* constitute a basis for the court to conclude that it is not likely the child will be adopted." (§ 366.26, subd. (c)(1), italics added.) If, as here, "the child is considered generally adoptable, we do not examine the

14

suitability of the prospective adoptive home." (*In re Michael G., supra,* 203 Cal.App.4th at p. 589; *In re Scott M.* (1993) 13 Cal.App.4th 839, 844.) "[T]he question of a family's suitability to adopt is an issue which is reserved for the subsequent adoption proceeding." (*In re Scott M.,* at p. 844.) Should Suzanne be unable to adopt for some unforeseen reason, the Agency identified 30 other approved families in San Diego County alone who want a child with Madison's characteristics.

We conclude substantial evidence supports the court's ruling. The assessment report contains significant information on Suzanne's devotion to Madison and K.T.,[8] her commitment to adopt both girls, the appropriateness of her home, her organizational skills and the quality of care she provided the girls over many months, and her ability to continue meeting their needs. The report also advises that Suzanne has no criminal record or child protective services involvement, is employed full time by San Bernardino County as an Adult Services social worker, has a stable job and home, and has a strong support system and adequate child care. The grandfather "describes her house as having every piece of baby equipment possible and tons of toys." Kelly does not state what other information the court should have required, other than a completed evaluation, a notion we reject.

---

[8] K.T. was a dependent child of the San Bernardino County juvenile court, which had enough confidence to place the child in Suzanne's care.

DISPOSITION

The judgment is affirmed.


                                                    HUFFMAN, Acting P. J.

WE CONCUR:


HALLER, J.


IRION, J.