Filed 2/15/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| ROBERT STURM, | B284553 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC637013) |
| v. | |
| TODD ANDREW MOYER et al., | |
| Defendants and Respondents. | |

APPEAL from an order of the Superior Court for Los Angeles County, Susan Bryant-Deason, Judge. Reversed.

Landsberg Law and Ian S. Landsberg for Plaintiff and Appellant.

Law Offices of Warren R. Shiell and Warren R. Shiell for Defendants and Respondents.

The question presented in this case is one of first impression: Assuming fraudulent intent, can the Uniform Voidable Transactions

Act (Civ. Code, § 3439 et seq., formerly known as the Uniform Fraudulent Transfer Act, or UFTA)[1] apply to a premarital agreement in which the prospective spouses agree that upon marriage each spouse's earnings, income, and other property acquired during marriage will be that spouse's separate property? After examining the language of the relevant statutes, the legislative history, and public policy considerations, we conclude that it can.[2]

## BACKGROUND

Our discussion of the background facts is based upon the allegations of the first amended complaint. Because this appeal is taken from a judgment of dismissal following the sustaining of a demurrer, we treat those alleged facts as true for the purposes of this appeal. (*Thaler v. Household Finance Corp.* (2000) 80 Cal.App.4th 1093, 1098.)

In July 2005, Robert Sturm, plaintiff in this action, obtained a $600,000 judgment in bankruptcy court against Todd Moyer. The judgment, which is not dischargeable in bankruptcy, was renewed in January 2015. Following the original entry of judgment and through

---

[1] The UFTA was renamed, with some amendments not relevant to this case, effective January 1, 2016. (Stats. 2015, ch. 44 (Sen. Bill No. 161), § 3.) Because the premarital agreement was executed before that date, we will refer to the relevant act as the UFTA; we will note when the current version of the act is different than relevant provisions of the UFTA.

[2] We have found no case from any court in any community property jurisdiction that has addressed this issue.

July 2016, Sturm conducted several judgment debtor examinations of Moyer, during which Moyer claimed to have no assets, and claimed that he did not intend to work ever again so he would not have to pay any portion of the judgment.

During a judgment debtor examination in July 2016, Sturm discovered that Moyer had married Jessica Schell in or around 2014, and that they had entered into a premarital agreement. The premarital agreement provided that each party's earnings and income, and any property acquired during the marriage by each spouse, would be that spouse's separate property; each party acknowledged that these earnings, income, and property otherwise would be community property. The agreement attached as exhibits lists of each party's significant real and personal property and liabilities in which that party currently held an interest; Moyer's list (Exhibit A) included Sturm's judgment against him, as well as several liens and pending lawsuits. The agreement also included a kind of sunset provision (paragraph 5.15), which provided that in the event the judgments and liens against Moyer listed in Exhibit A, and any money judgment entered against him during marriage, lapse or otherwise become unenforceable for any reason, the parties' earnings and income, and any assets purchased with those earnings and income, from the date of the marriage will be treated as community property, with certain exceptions. Finally, the premarital agreement included a provision allowing the parties to open a jointly owned checking account to meet their reasonable present and future living expenses, but providing that any property acquired with funds from the account will be owned in the ratio of the respective

3

contributions of each party's separate property into the account; it also expressly stated that the account will not create any community property interest.[3]

Sturm filed the instant lawsuit against defendants Moyer and Schell, asserting a single cause of action under the UFTA to set aside the alleged transfer of Moyer's community property interest in Schell's earnings and income. The original complaint attached as an exhibit the Moyer-Schell premarital agreement. Following defendants' successful demurrer to the original complaint, Sturm filed a first amended complaint alleging the same cause of action. Defendants again demurred, and the trial court sustained the demurrer without leave to amend.

In sustaining the demurrer, the trial court found that "[u]nder *In re Marriage of Dawley* (1976) 17 Cal.3d 342 and Family Code § 1500, defendants were entitled to alter the presumptions under Family Code § 760 and Family Code § 910(a) that property acquired during the marriage is community property and that the community estate would

---

[3]    Further, the agreement included the following provision: "It is the express intention of the parties to opt out of, and to waive, the community property system, the marital property system, the matrimonial property system and out of any other system that provides for the acquisition of interest in property or the distribution of property, or both, by virtue of marriage. The only way in which community property can be created during the marriage is by a valid written transmutation signed by both parties changing separately owned property into community property or the acquisition of an asset with income and earnings of a party that are community property after the modification of this Agreement pursuant to paragraph 5.15."

be liable to satisfy any judgments against defendant Todd Moyer. Even though the Premarital Agreement was not effective until Defendants married, pursuant to Family Code § 1613, Defendants still had the right to alter the presumptions of community property under *Dawley*."

A judgment of dismissal was entered, from which Sturm timely filed a notice of appeal.

## DISCUSSION

Sturm has alleged, in substance, that the Moyer-Schell premarital agreement effected a transfer of Moyer's interest in community property (i.e., Schell's earnings and income), and that the actual intent of this transfer was to hinder, delay, or defraud Moyer's creditors, including Sturm. To decide whether the agreement is one to which the UFTA applies, we must examine the relevant provisions of both the UFTA and the Family Code.

A. *Relevant UFTA Provisions*

At the time of the events at issue in this lawsuit, the UFTA provided, in relevant part, that "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor . . . if the debtor made the transfer or incurred the obligation . . . [¶] (1) With actual intent to hinder, delay, or defraud any creditor of the debtor."[4] (Civ. Code,

---

[4] Because the case before us involves allegations of actual fraud, as described in Civil Code, former section 3439.04, we do not include in our discussion the conditions for constructive fraud set forth in the statute.

5

former § 3439.04; the current version of this statute replaces "fraudulent" with "voidable.") A "transfer" was defined in the UFTA to mean "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." (Civ. Code, former § 3439.01, subd. (i); the definition is found as subd. (m) of the current version, with one amendment that is irrelevant here and would not affect our analysis.)

Civil Code section 3439.06 contains provisions regarding when a transfer is made and deemed perfected for purposes of the UFTA.[5] Subdivision (d) of that statute provides that "A transfer is not made until the debtor has acquired rights in the asset transferred." (Civ. Code, § 3439.06, subd. (d).)

B.    *Relevant Family Code Provisions*

Under California law, all property (with some statutory exceptions) acquired by a married person while domiciled in California is community property (Fam. Code, § 760), and each spouse's respective interests in community property "are present, existing, and equal" during the marriage (Fam. Code, § 751). However, the Family Code allows a couple by agreement entered into during or before the

_____

[5]    The current version of Civil Code section 3439.06 is almost identical to the former version found in the UFTA; the differences do not change the analysis.

6

marriage to change the character of the property they acquire during marriage from community property to separate property.

Such an agreement may be made during the marriage under Family Code section 850, which provides that, subject to certain provisions, "married persons may by agreement or transfer, with or without consideration, do any of the following: [¶] (a) Transmute community property to separate property of either spouse. [¶] (b) Transmute separate property of either spouse to community property. [¶] (c) Transmute separate property of one spouse to separate property of the other spouse." One of the provisions referenced in that section is Family Code section 851, which states: "A transmutation is subject to the laws governing fraudulent transfers."

Before the marriage, couples may change the character of property acquired during marriage from community property to separate property by means of a premarital agreement under the Uniform Premarital Agreement Act (Fam. Code, § 1600 et seq., hereafter the UPAA).[6] The UPAA provides that the parties to a premarital agreement may contract with respect to various issues, including: "[t]he rights and obligations of each of the parties in any of the property[7] of either or both of them whenever and wherever acquired or

---

[6] Family Code section 1500 also authorizes the use of a premarital agreement to change the character of property acquired during marriage. It provides: "The property rights of spouses prescribed by statute may be altered by a premarital agreement or other marital property agreement."

[7] "Property" is defined in the UPAA as "an interest, present or future, legal or equitable, vested or contingent, in real or personal property, including income and earnings." (Fam. Code, § 1610, subd. (b).)

7

located" (Fam. Code, § 1612, subd. (a)(1)), and "[a]ny other matter, including their personal rights and obligations, not in violation of public policy or a statute imposing a criminal penalty" (Fam. Code, § 1612, subd. (a)(7)). The premarital agreement "becomes effective upon marriage." (Fam. Code, § 1613.)

The characterization of property as separate or community is important when it comes to liability for debts incurred by either spouse, including debts incurred by a spouse before the marriage. Family Code section 910 states in relevant part: "Except as otherwise expressly provided by statute, the community estate is liable for a debt incurred by either spouse before or during marriage, regardless of which spouse has the management and control of the property and regardless of whether one or both spouses are parties to the debt or to a judgment for the debt." (Fam. Code, § 910, subd. (a).) Notwithstanding this provision, the earnings of the non-debtor-spouse[8] -- which are community property under Family Code section 760 -- "are not liable for a debt incurred by [the other] spouse before marriage." (Fam. Code, § 911, subd. (a).) Those earnings remain not liable for the debtor-spouse's premarital debt, however, only "so long as they are held in a deposit account in which the person's spouse has no right of withdrawal and are uncommingled with other property in the community estate, except property insignificant in amount." (*Ibid.*)

---

[8]  "Earnings" is defined as "compensation for personal services performed, whether as an employee or otherwise." (Fam. Code, § 911, subd. (b)(2).)

8

In short, although a married couple's community property is liable for the premarital debts of either spouse, a portion of that community property -- the non-debtor-spouse's earnings and income -- is shielded from liability for that premarital debt to the extent that those earnings and income are held in an account to which the debtor-spouse does not have access and are not commingled (except for insignificant amounts).

C. *Does the Premarital Agreement Alleged Here Effect a "Transfer" Within the Meaning of the UFTA?*

Having set forth the relevant statutory provisions, we consider whether the UFTA applies to premarital agreements (such as the one at issue here) that make each spouse's earnings, income, and other assets acquired during marriage that spouse's separate property. Resolution turns on two key questions. First, does such an agreement effect a "transfer" under the UFTA? Second, was the agreement intended to "hinder, delay, or defraud any creditor" of the debtor-spouse? The first question is one of law, and can be resolved in this appeal from a demurrer judgment. The second question is one of fact, which cannot be determined on a demurrer or an appeal from a demurrer. We simply note that the complaint alleges sufficient facts to meet the requirement of fraudulent intent, but proof of those facts awaits trial.

Considering the first question, as noted, "transfer" under the UFTA has a broad meaning. It includes "every mode, direct or indirect, absolute or conditional, . . . of disposing of or parting with an asset or an interest in an asset." (Civ. Code, former § 3439.01, subd. (i); currently, Civ. Code, § 3439.01, subd. (m).) Under this definition, there is no

9

doubt that an agreement made *during marriage* in which a debtor-spouse agrees that the non-debtor-spouse's future earnings, income, or assets would be the non-debtor-spouse's separate property constitutes a transfer because the debtor-spouse is parting with an interest in an asset -- the community property represented by the other spouse's earnings -- in which he or she has a "present [and] existing . . . interest[]" (Fam. Code, § 751) during continuance of the marriage. (See *State Bd. of Equalization v. Woo* (2000) 82 Cal.App.4th 481.)

But what if this same agreement is made in a premarital agreement? Because the parties are not married when the agreement is entered into, the debtor-spouse has no present and existing interest in the community property represented by the non-debtor-spouse's future earnings, income, and assets. Thus, it can be argued (as defendants do here) that no transfer takes place because, by the premarital agreement, the spouses altered the applicability of the community property laws such that neither spouse obtains any interest in community property upon marriage. On the other hand, it can be argued (as Sturm does here) that by law the premarital agreement does not become effective until marriage (Fam. Code, § 1613), at which point two things happen -- each spouse obtains a present interest in community property by operation of law (Fam. Code, § 751) and then, by agreement, each spouse transfers to the other his or her community interest in the other's earnings, income, or other property acquired during the marriage.

To determine which argument prevails, "'we must ascertain the intent of the drafters [of the UFTA and Family Code] so as to effectuate

10

the purpose of the law.  [Citation.]  Because the statutory language is generally the most reliable indicator of legislative intent, we first examine the words themselves, giving them their usual and ordinary meaning and construing them in context.'  [Citation.]  '[E]very statute should be construed with reference to the whole system of law of which it is a part, so that all may be harmonized and have effect.'  [Citation.]  'Where as here two codes are to be construed, they "must be regarded as blending into each other and forming a single statute."  [Citation.]  Accordingly, they "must be read together and so construed as to give effect, when possible, to all the provisions thereof."  [Citation.]'  [Citation.]"  (*Mejia v. Reed* (2003) 31 Cal.4th 657, 663.)

"When the plain meaning of the statutory text is insufficient to resolve the question of its interpretation, the courts may turn to rules or maxims of construction 'which serve as aids in the sense that they express familiar insights about conventional language usage.'  [Citation.]  Courts also look to the legislative history of the enactment.  'Both the legislative history of the statute and the wider historical circumstances of its enactment may be considered in ascertaining the legislative intent.'  [Citation.]  Finally, the court may consider the impact of an interpretation on public policy, for '[w]here uncertainty exists consideration should be given to the consequences that will flow from a particular interpretation.'  [Citation.]"  (*Mejia v. Reed, supra*, 31 Cal.4th at p. 663.)

     1.    *Statutory Language*

As the Supreme Court observed in *Mejia v. Reed*, the language of the UFTA on its face applies to all transfers, including transfers of interests in community property during marriage and in marriage settlement agreements. (*Mejia v. Reed*, *supra*, 31 Cal.4th at p. 664.) But the UFTA also states that "[a] transfer is not made until the debtor has acquired rights in the asset transferred." (Civ. Code, § 3439.06, subd. (d).)

As we have noted, under the Family Code, a spouse has a present and existing interest in community property *during marriage*. (Fam. Code, § 751.) But a premarital agreement is, by statutory definition, "an agreement between *prospective* spouses made in contemplation of marriage." (Fam. Code, § 1610, subd. (a), italics added.) Thus, at the time the premarital agreement is entered into, neither spouse has "acquired rights" (Civ. Code, § 3439.06, subd. (d)) in community property. On the other hand, a premarital agreement does not become *effective* until marriage. (Fam. Code, § 1613 ["A premarital agreement becomes effective upon marriage"].) This suggests that at the moment of marriage, each spouse acquires rights to community property that are (if the premarital agreement calls for it) immediately transferred.

Defendants contend there is no transfer, because the UPAA allows spouses to "opt out of the community property system," and therefore neither spouse ever acquires an interest in community property. But this characterization is not accurate. The UPAA does not state that a couple may prospectively "opt out" of the statutory community property law. Instead, the UPAA provides in substance that -- "effective upon marriage" (Fam. Code, § 1613) -- the couple may reorder from

12

community to separate the property rights established by the community property statutes: "Parties to a premarital agreement may contract with respect to . . . [¶] [t]he rights and obligations of each of the parties in any of the property of either or both of them whenever and wherever acquired." (Fam. Code, § 1612, subd. (a)(1); see also Fam. Code, § 1500 [providing that "[t]he property rights of spouses prescribed by statute may be altered by a premarital agreement"].) Thus, by such a contract the parties do not "opt out" of community property law as if it never applied. Rather, they acknowledge that community property law governs their "rights and obligations . . . [in each other's property] whenever and wherever acquired" (Fam. Code, § 1612, subd. (a)(1)), and they simply agree to reorder those rights and obligations effective upon marriage. (*In re Marriage of Dawley*, *supra*, 17 Cal.3d at p. 358 [describing premarital agreement in which parties agreed that earnings and property acquired by a spouse during marriage would be that spouse's separate property as a "reordering of property rights to fit the needs and desires of the couple"].)

Nonetheless, although the statutory language suggests that such a contract effects a transfer within the meaning of the UFTA, especially given the broad definition of "transfer," the statutory language does not conclusively resolve the issue. Therefore, we must look to the legislative history to see if it discloses the legislative intent.

2. *Legislative History*

The legislative history of the UFTA is enlightening, but not dispositive. Civil Code section 3439.06, enacted in 1986 as part of

13

Senate Bill No. 2150 (Stats. 1986, ch. 383, § 2, pp. 1591-1592), addresses when a transfer is made and deemed perfected for purposes of the UFTA. The Report of Assembly Committee on Finance and Insurance on Senate Bill No. 2150 set forth the comments of the National Conference of Commissioners on Uniform State Laws as reflecting the intent of the Committee. (Report of Assembly Committee on Finance and Insurance on Sen. Bill No. 2150, found at Assembly Journal, vol. 5, pp. 8569-8587 (July 8, 1986) at p. 8570.) The comments explained the purpose of section 3439.06, and expressly referred to transfers as including "execution of a marital or premarital agreement for the disposition of property owned by the parties to the agreement." (*Id.* at p. 8582.) This reference shows an intent that premarital agreements disposing of "property owned by the parties" at the time of execution would constitute a transfer under the UFTA. But the reference does not literally apply to the premarital agreement here, because when the agreement was executed neither spouse "owned" an interest in the prospective community property that, upon marriage would be "transferred," i.e., become separate property.

With regard to the legislative history related to premarital agreements as reflected in the Family Code and its predecessor statutes,[9] we note that the issue with which we are now faced was

---

[9] Until 1994, the statutes relating to family law, including the Family Law Act, were found in the Civil Code, Code of Civil Procedure, Evidence Code, and Probate Code. In 1992, the Legislature repealed all those statutes and recast them as the Family Code, operative January 1, 1994. (Stats. 1992, ch. 162, §§ 1-14, pp. 463-722.)

14

briefly addressed in a background study -- Reppy, *Debt Collection from Married Californians: Problems Caused by Transmutations, Single-Spouse Management, and Invalid Marriage*, 18 San Diego L. Rev. 143 (1981) (hereafter Reppy) -- prepared for the California Law Revision Commission for its study of whether the law relating to community property should be revised.[10] (*Liability of Marital Property for Debts*, 17 Cal. L. Revision Comm'n Reports 1, 3 (1984).) In the background study, Professor Reppy addresses myriad issues involving debt collection from married people under California law as it then existed, pointing out problems where he saw them, and recommending changes to the law.

In a short section on premarital agreements, Professor Reppy noted that the placement of the then-existing statutes governing premarital agreements in the Family Law Act (the article was written before the enactment of the Family Code or the UPAA), "implies that such a contract is a means for varying the statutory rules that would otherwise attach to a marriage. A typical 'marriage settlement'[11] is an agreement to live separate in property. By permitting such a contract, [former Civil Code] section 5134 creates a situation whereby a community of property never exists between the spouses. Thus when after marriage *W* labors at her job and is paid wages, they are at all

---

[10] The Commission's study was authorized by Resolution Chapter 65 of the Statutes of 1978. (*Liability of Marital Property for Debts*, *supra*, 17 Cal. L. Revision Comm'n Reports at p. 3.)

[11] Professor Reppy noted that former section 5134 of the Civil Code provided that "parties anticipating marriage may make 'marriage settlements.'" (Reppy, *supra*, 18 San Diego L. Rev. at p. 226.)

times hers. The alternative construction is that the community property statutes, such as [former Civil Code] section 5110, attach to *W*'s wages and then the antenuptial contract immediately converts the coownership between *H* and *W* to the sole ownership of *W*. The first interpretation is preferable. Under that interpretation, a creditor of insolvent *H* unable to reach *W*'s separate property could not object to characterization of the earnings as *W*'s separate property on grounds *H* was already or was thereby rendered insolvent. Under the alternative view, there is a transfer at the time *W* is paid which is constructively fraudulent under [the Uniform Fraudulent Conveyance Act[12]]." (Reppy, *supra*, 18 San. Diego L. Rev. at p. 226.)

In his conclusion of the premarital agreement section Professor Reppy stated, "With respect to creditors existing at the time of making of the [premarital] agreement, rather than at the time of an alleged subsequent 'transfer', the agreement to live separate in property should not be constructively fraudulent. The debtor spouse simply changes his status from single to married with the creditor having the same rights as existed before the change of status. Of course actual fraud might be proved to give the creditor relief under [the Uniform Fraudulent Conveyance Act]."[13] (Reppy, *supra*, 18 San. Diego L. Rev. at p. 227.)

---

[12] The Uniform Fraudulent Conveyance Act (Stats. 1939, ch. 329, § 2, p. 1667) was replaced by the UFTA in 1986 (Stats. 1986, ch. 383, §§ 1, 2, pp. 1589-1590).

[13] We assume by this reference to actual fraud that Professor Reppy is referring to a situation in which the parties contracted to live separate in property but did not in fact keep their separate property separate.

Although Professor Reppy identified the two competing constructions regarding the applicability of the UFTA to premarital agreements that the parties in this case present, and stated his preference for the construction asserted by defendants, we cannot say that this is dispositive.  First, we observe that the Commission did not recommend -- and the Legislature did not enact -- any statutory provisions that implement this construction.

Second, several years after Professor Reppy wrote the background study in 1981, the Legislature enacted the UPAA, which included the provision that a premarital agreement does not become effective until marriage.  (Stats. 1985, ch. 1315, § 3, p. 4583.)  This addition tends to undermine the construction preferred by Professor Reppy, because (as Sturm argues) the agreement is not effective until marriage, at which time it effects a reordering of the parties' community property interests in each other's property acquired during marriage.

Third, we note that Professor Reppy's interpretation of the law was not always consistent with interpretations of the law by California courts.  For example, in his section on postnuptial transmutations, Professor Reppy stated that "[a] postnuptial agreement by *H* and *W* that both would thereafter live separate in property should be viewed as eliminating the community from their marriage at that moment. Accordingly, when one of the spouses later is paid earnings during marriage, they are his or her separate property *ab initio*; community status does not attach to the earnings to be *eo instante* converted into separate property by a transfer, possibly fraudulent, from the nonearning spouse of his or her community half interest."  (Reppy,

17

*supra*, 18 San. Diego L. Rev. at p. 228.) But the court in *State Bd. of Equalization v. Woo, supra*, 82 Cal.App.4th 481, came to a different conclusion, holding that an agreement entered into during marriage in which the spouses agree that future earnings by each spouse would be that spouse's separate property was subject to the UFTA.

Finally, Professor Reppy's suggestion that the construction asserted here by defendants is preferable because the debtor-spouse has only changed his or her status from single to married and the position of the creditor has not changed ignores the fact that, with agreements such as the one in this case, it is not just the debtor-spouse's marital status that changes. With provisions such as the joint bank account provision in the Moyer-Schell agreement, the debtor-spouse is able to significantly increase his or her standard of living while at the same time preventing creditors from accessing the funds used for that increase.

Moreover, the legislative history of the predecessor to Family Code section 911 -- former section 5120.110, subdivision (b) of the Civil Code (Stats. 1984, ch. 1671, § 4, p. 6020) -- calls into question the acceptance of Professor Reppy's viewpoint. At the time of the professor's study, California law protected the non-debtor spouse's earnings from liability only for premarital contract debts. (Civ. Code, former § 5120 [Stats. 1969, ch. 1608, § 8, p. 3341].) The Legislature subsequently replaced former section 5120 with former section 5120.110, which extended the protection of the non-debtor-spouse's earnings from liability for *any* premarital debt of the other spouse, and provided that those earnings were protected only so long as they were held in an account in which the

18

debtor-spouse had no right of withdrawal and were not commingled with other community property except property insignificant in amount. (Civ. Code, former § 5120.110, subd. (b).) In recommending the enactment of this provision, the California Law Revision Commission explained that the earnings of the non-debtor-spouse should be protected because they are "peculiarly personal." (*Liability of Marital Property for Debts*, *supra*, 17 Cal. L. Revision Comm'n Reports at p. 18.) However, the Commission recommended "that the earnings should lose their protection from liability upon a change in form, [and] . . . should retain their protection [only] so long as traceable in bank accounts. This will ensure that substantial amounts of community property are not immunized from creditors, that the judicial system is not burdened by extensive tracing requirements, and that earnings will remain exempt so long as they retain their peculiarly personal character." (*Ibid.*) In other words, the Legislature wanted to protect the non-debtor-spouse's earnings from liability for the premarital debts of the debtor-spouse only to the extent the debtor-spouse did not share in those earnings.

Although not conclusive, we find the legislative history of the UFTA and the relevant provisions of the Family Code, like the language of the statutes, suggest that the UFTA applies to premarital agreements like the one in this case. We turn to public policy considerations to determine whether that interpretation should prevail.

3. *Policy Considerations Favor the Application of the UFTA to Premarital Agreements Like the One in This Case*

Because the statutory language and the legislative history suggest, but do not conclusively establish, that the Legislature intended the UFTA to apply in this situation, we turn to the policy considerations favoring and disfavoring each side's interpretation of the statutes. On the whole, those policy considerations favor the interpretation asserted by Sturm.

In *Mejia v. Reed*, the Supreme Court declared that "[t]he California Legislature has a general policy of protecting creditors from fraudulent transfers, including transfers between spouses" in a case that addressed whether the UFTA applied to a transfer of one spouse's interest in community property as part of dissolution of the marriage.[14] (*Mejia v. Reed*, *supra*, 31 Cal.4th at p. 668.) In deciding that the transfer was subject to the UFTA, the Court found that, "[i]n view of this overall policy of protecting creditors, it is unlikely that the Legislature intended to grant married couples a one-time-only opportunity to defraud creditors by including the fraudulent transfer in an MSA." (*Mejia v. Reed*, *supra*, 31 Cal.4th at p. 668.)

Admittedly, there is a competing policy at play with regard to *premarital* agreements that was not present in *Mejia*. That is, there is a long-standing policy in favor of marriage in this state. (See *In re*

---

[14] In the case before it, the husband transferred all of his interest in jointly-owned real property to wife, and the wife transferred all of her interest in the husband's medical practice to the husband in a marriage settlement agreement. (*Mejia v. Reed*, *supra*, 31 Cal.4th at p. 662.) Shortly thereafter, the husband abandoned his medical practice, was living with his mother, and had no assets and no income. (*Ibid.*)

*Marriage of Dawley, supra*, 17 Cal.3d at p. 350; *In re Marriage of Pendleton & Fireman* (2000) 24 Cal.4th 39, 52.) And premarital agreements facilitate marriage by allowing the parties to "reorder[] . . . property rights to fit the needs and desires of the couple." (*In re Marriage of Dawley, supra*, 17 Cal.3d at p. 358; see also *In re Marriage of Pendleton & Fireman, supra*, 24 Cal.4th at p. 53 [observing that the availability of an enforceable premarital agreement may encourage marriage].)

It might be argued that applying the UFTA to a premarital agreement in which the parties agree that each party's earnings, income, and assets acquired during marriage would be that party's separate property would discourage marriage in cases, such as the present one, in which one of the parties has significant debts while the other party has substantial income. But the Legislature already has provided protection for the couple in such a case, by enacting Family Code section 911. As noted, under that statute, the non-debtor-spouse's earnings are sheltered from liability for the debtor-spouse's premarital debts, so long as those earnings are kept by the non-debtor-spouse in a separate account (to which the debtor-spouse does not have a right of withdrawal) and are not commingled with other property in the community estate. This provision demonstrates, not only an intent to protect the non-debtor-spouse's earnings, but also a policy judgment -- an intent to prevent the debtor-spouse from taking advantage of that protection at the expense of his or her creditors by being allowed access to the protected funds.

21

D.    *Conclusion*

In light of the suggestions raised by the legislative language and history, and the strong policy -- advanced by both the UFTA and section 911 of the Family Code -- of protecting the rights of creditors from fraudulent transfers, we conclude that the Legislature must have intended that UFTA can apply to premarital agreements in which the prospective spouses agree that each spouse's earnings, income, and property acquired during marriage will be that spouse's separate property.  The policy considerations in favor of applicability of the UFTA are especially strong in this case, where the agreement provides that all earnings and income, and property acquired with those earnings and income, dating back to the date of marriage will become community property when certain premarital debts no longer are enforceable, and where the agreement allows the debtor-spouse joint access to the non-debtor-spouse's earnings and income that are deposited in a joint account.

Our conclusion that the UFTA *can* apply to a premarital agreement does not mean that it necessarily *will* apply to invalidate the agreement here.  Whether the UFTA applies in this (or any) case depends upon whether there was actual or constructive fraud under Civil Code section 3439.04.  That issue is a factual one, and is not before us in this appeal from a judgment of dismissal following the sustaining of a demurrer.

**DISPOSITION**

22

The judgment is reversed.  Sturm shall recover his costs on appeal.

**CERTIFIED FOR PUBLICATION**

WILLHITE, Acting P. J.

We concur:

COLLINS, J.

DUNNING, J.*

---

*Retired Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.