Filed 12/4/23  Dornan v. Gonzalez CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| LYNSY DORNAN et al., | D081096 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. 37-2020-00015971-CU-FR-CTL) |
| ARMANDO GONZALEZ et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of San Diego County, Joel R. Wohlfeil, Judge.  Affirmed.

Grant & Kessler, Alexander Kessler and Phillip A. Zunshine for Plaintiffs and Appellants.

Law Offices of Brandon M. Smith and Brandon Michael Smith for Defendants and Respondents.

Plaintiffs and appellants Lynsy Dornan and Tracy Wong filed a lawsuit against defendants and respondents Armando Gonzalez and Marsha Gonzalez to, among other claims, set aside transfers under the Uniform

Voidable Transactions Act (UVTA; Civ. Code,[1] § 3439 et seq.), alleging defendants participated in a fraudulent transfer of community and separate property assets, including their residence, so as to prevent plaintiffs from enforcing judgments against Armando. Following a bench trial, the court ruled plaintiffs did not meet their burden to show it was more likely than not that Armando and Marsha intended to convey the property to defraud creditors generally or the plaintiffs specifically.

Asking us to independently apply the law to what they say are undisputed facts, plaintiffs contend the court erroneously evaluated "so-called 'badges of fraud' indicating such intent" (*Aghaian v. Minassian, supra*, 59 Cal.App.5th at p. 456) using a pure mathematical formula. According to plaintiffs, they presented "overwhelming and undisputed evidence" (emphasis omitted) supporting the applicable badges of fraud and the court improperly focused on Marsha's, rather than Armando's, intent in reaching its decision. We reject the contentions and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

We state the facts in part from the parties' pretrial stipulation to facts, and summarize other facts in the light most favorable to the judgment. Armando and Marsha married in 1992, and as of late 2000 owned a residence in El Cajon (the property).

---

[1] We refer to the defendants by their first names to avoid confusion and not out of disrespect. Undesignated statutory references are to the Civil Code unless otherwise specified. The UVTA was formerly known as the Uniform Fraudulent Transfer Act or UFTA. (*Sturm v. Moyer* (2019) 32 Cal.App.5th 299, 303 & fn. 1 [UFTA was renamed effective January 1, 2016]; see also *Aghaian v. Minassian* (2020) 59 Cal.App.5th 447, 455, fn. 8.) The enactment did not change the essential elements of a cause of action for a voidable transfer. (*Aghaian*, at p. 455, fn. 8.)

In 2010, Armando, a Border Patrol Agent with the Department of Homeland Security Customs and Border Patrol, was plaintiffs' supervisor at the Chula Vista Border Patrol Station. In 2015, a hidden camera was discovered in the women's restroom at that station. Armando admitted to installing the camera, and in March 2015, he was arrested and charged with multiple federal criminal counts.

In mid-April 2015, Marsha, who was represented by counsel, petitioned for divorce in San Diego Superior Court.[2] Armando and Marsha thereafter continued to live at the property. The following month, Armando pleaded guilty to eight of the federal criminal counts.

In early December 2015, Armando and Marsha entered into a marital settlement agreement. Under it, Armando agreed to give Marsha one half of his retirement plans, and Marsha was to receive title to the property, which had debt against it owed to Marsha's mother. Armando did not receive any bank accounts, vehicles, or other personal possessions that were worth more than a thousand dollars. Marsha agreed to waive her right to receive spousal support. At the time, the total value of Armando and Marsha's assets was around $530,000.

The day after they signed the marital settlement agreement, Marsha recorded a quitclaim deed by which Armando quitclaimed his interest in the property to her. They did not investigate the property's value at that time, hire an appraiser for an estimate of the home's value, or have any professional perform a market analysis or assess the home's condition. Marsha's attorney explained to Armando that if he agreed to the settlement,

---

[2] The court dismissed this dissolution proceeding after Marsha's counsel failed to appear at a three-year statute dismissal hearing. Marsha later learned her counsel had passed away. She refiled her divorce petition in 2020, and a divorce judgment was issued in March 2021.

Marsha would be responsible for all the accumulated debt, constituting approximately $137,000 in loans from Marsha's mother for the property's downpayment secured by a deed of trust, as well as approximately $100,000 to pay for Armando's legal expenses. Armando believed the agreement was fair, as Marsha wanted to keep the house and he wanted to eliminate his debt. Armando and Marsha did not discuss the possibility he would be exposed to civil damages related to his crimes, nor did he discuss that possibility with Marsha's lawyer. Armando told Marsha's counsel that his expectation was to be free of his debts, not to transfer the property so his creditors could not get to it.

Plaintiffs did not notify Armando that they were planning to file a civil lawsuit against him at any point before he and Marsha executed the marital settlement agreement, and Armando at the time of entering into that agreement did not consider in any way the possibility of future civil lawsuits being brought against him. He understood the quitclaim and transfer was part of his and Marsha's divorce settlement. After entering into the marital settlement agreement, Armando did not believe he had any ownership rights in the house or any right to live there if Marsha did not permit him; he knew if he did not abide by Marsha's conditions she would ask him to leave and he had no right to refuse.[3]

About a week after Armando and Marsha entered into the marital settlement agreement, the court in the federal criminal action sentenced Armando to 21 months in prison.

---

[3] Only later did Armando become aware that Marsha's divorce proceeding had been dismissed for failure to prosecute it. He testified he and Marsha did not reconcile after December 2015, and Armando did not pay for any of the property's taxes, insurance or significant maintenance and improvements. Armando did not contest Marsha's refiled divorce petition. They remained legally separated until March 2021.

Over a year later in March 2016, plaintiffs filed a federal civil lawsuit against Armando and others alleging privacy violations and intentional infliction of emotional distress among other claims. Armando was released from prison in February 2017. Plaintiffs settled their cases against the federal government, and eventually obtained a default judgment against Armando. In October 2018, the court in that action entered two separate judgments awarding each plaintiff over $5.7 million in damages and attorney fees. Armando never voluntarily made any payments on the judgments.

In 2020, plaintiffs filed suit against Armando, Marsha and others alleging causes of action under the UVTA to set aside voidable transactions, as well as for fraud and declaratory relief. In their operative first amended complaint, plaintiffs alleged in part that Armando's transfer of the property to Marsha, and other transfers of money, negotiable instruments and other personal property, were "made with the actual intent to hinder, delay, or defraud the creditors of Armando in violation of . . . [section] 3439.04[, subdivision] (a)(1)."

The matter proceeded to a bench trial solely on plaintiffs' causes of action related to the property's transfer. Plaintiffs' counsel agreed the court's findings relating to the statutory UVTA cause of action would encompass those findings needed for plaintiffs' common law fraud and declaratory relief claims. He also agreed it was plaintiffs' burden to make a prima facie showing of inadequate consideration and intent.

The sole witnesses at trial were Armando and Marsha. In part, Armando testified that about the time he and Marsha entered into the marital settlement agreement he never considered that he might face civil liability to the plaintiffs, because his attention was on going to prison and his criminal case. After he pleaded guilty, he focused on going to therapy and his

5

mental health, the idea that he was a prison-bound former law enforcement officer, and how his actions had hurt others. He believed that in 2015 and 2016, he did not take steps to separate his assets from Marsha's.

In addition to the circumstances of her and Armando's marital settlement agreement, Marsha described her relationship problems with Armando, which predated January 2015, and the reasons behind her ultimate decision to file for divorce. She first contemplated divorce in mid-2013, but finally made the decision in January 2015 after Armando was detained, stating she felt she failed as a wife, failed in her efforts to get him help, and failed in helping him maintain his faith, which she described as the foundation for their marriage. She denied her decision was motivated by a desire to protect their home from potential creditors. She told her divorce attorney during her initial conversation with him that she just wanted the house. Neither she nor Armando had the financial means to buy out the other in the property and it had debts, so her lawyer arranged what he believed was a fair way for her to obtain the house in the proceeding, including by her waiving all spousal support for the rest of her life and taking on Armando's debt. The divorce attorney amended the agreement later to give Marsha one half of Armando's retirement pay. Marsha's counsel explained the terms of the marital settlement agreement to Armando. At the time Marsha entered into it, she relied on her counsel's advice and opinion about the agreement's fairness. She did not try to tell her attorney what she thought was fair or valuable.

Marsha also testified that before signing the marital settlement agreement, she never discussed with either Armando or her lawyer the possibility of Armando's exposure to civil damages relating to his crimes, and she was not aware of any threats by the plaintiffs or any other victims that

6

they were going to sue Armando. She did not consider that possibility in any way in entering into the agreement. When he was preparing the agreement, Marsha's lawyer did not tell her there might be consequences to Armando's criminal conviction or a potential civil action.

Marsha confirmed that she accurately depicted her feelings about her husband and her thought processes in seeking a divorce in a lengthy letter that she had submitted to the court in Armando's criminal matter. At the time she decided she wanted to file for divorce, she had no knowledge of what was going on with Armando's criminal charges; he had not at that time pleaded guilty to the offenses and she had not personally made up her mind whether she believed the allegations against him. After she made her decision to divorce Armando, they continued to live in the house, but ended their intimate relations. They slept in separate locations, and Marsha imposed conditions that he continue his faith and undergo therapy, as he had previously contemplated suicide. Marsha permitted Armando to move back into the house after he was released from prison under the same conditions. Before and after his incarceration, Armando gave Marsha assistance with her medical condition, administering medication, overseeing her, and taking her to some doctor appointments. That assistance factored into Marsha's decision to allow him to reside in her house. She testified that since her and Armando's March 1, 2015 date of separation, they had never reconciled in a marital way.

As of the time of trial, Marsha, Armando and Armando's brother resided at the property. Armando did not pay rent, and Marsha paid for the property's upkeep as well as household expenses and bills. Armando admitted he owed over $11.5 million on the judgments.

7

After the close of evidence, the court acknowledged the pleadings and exhibits it had reviewed, including the parties' trial briefs, the quitclaim deed, the marital settlement agreement, and Marsha's letter to the sentencing court. It said: "I have read plenty going into this morning's trial. But I've got an awfully good idea of your respective theories and the evidence that I suspect that you're going to bring to my attention that supports your theory. [¶] Now, ultimately, though, plaintiff[s] bear[ ] the burden of proof. And what I'd like to suggest we do, is that let's just go through each of the 11 factors or badges [of fraud]. I keep wanting to call them elements. They're not really elements, I understand. But, ultimately, depending upon how many of those plaintiff[s] ha[ve] carried their burden will dictate whether or not plaintiff[s] win or [don't] win. But it really does come down, to from the Court's perspective, whether plaintiffs ha[ve] carried their burden. [¶] So let's just go through them, without playing favors one way or the other . . . ."

The court and counsel discussed the badges of fraud, and the court made findings as to each.[4] Thereafter, the court issued its ruling from the bench. It acknowledged that the plaintiffs had done nothing wrong. It also acknowledged circumstances of tragedy, in part reflected in Marsha's letter to the sentencing court in Armando's criminal matter. The court explained it was "not shy" about rendering plaintiff's verdicts generally, but that the case before it had unusual "nuances." It said: "The fact that there was a lawyer involved actually calls into question the soundness of plaintiffs' theory, bodes well for the defense.· . . . The court sees fraudulent conveyances, whether it's in context of a true fraudulent conveyance lawsuit or not, but I see those transactions a lot. But I don't often see lawyers who are memorializing, who are giving it some level of propriety. It's usually the parties themselves that are creating these without counsel involved. [¶] I recognize that from plaintiffs' perspective, the fact that Mr. and Mrs. Gonzalez, although divorced, have continued to live under the same roof, calls into question the

---

4      After allowing counsel to give input on each factor, the court found that the evidence showed the property transfer to Marsha was to an insider; plaintiffs did not prove Armando retained possession or control over the property after the transfer; the property transfer was disclosed; plaintiffs proved a reasonable person in Armando's position would have understood he was at risk of a civil lawsuit by one or more of the individuals who he captured on hidden camera; plaintiffs did not show in light of Armando's 20-year federal pension that the transfer was of substantially all of his assets; Armando did not abscond, or deceptively remove or conceal assets; plaintiffs proved Armando did not receive reasonably equivalent consideration in the transfer; Armando was not insolvent at the time of the transfer, but became so shortly thereafter; and plaintiffs proved the transfer occurred shortly before a substantial debt, meaning the contingent liability arising from Armando's criminal conduct. The court found the last badge—relating to transfer of assets to a lienholder who then transferred to an insider— inapplicable. The court then expressed that plaintiffs had carried their burden on five of the badges, but failed "in whole or in part" on eight of them.

genuineness of this transaction, that it suggests that Mr. Gonzalez really is driving this ship. After having spent three years in the family department, though, I can assure you that these arrangements are not as uncommon as you might think they are. And I think that's probably happened a lot more, given what's going on with the cost of housing. The alternative is that one or both of them end up on the street. So the good news is that it appears, from the court, that Mr. and Mrs. Gonzalez are civil, if not enjoy a cooperative relationship. . . . [¶] So this isn't as odd of an arrangement, as, say, plaintiff[s] might suggest. Counsel's argument . . . that the house had to go to someone resonates with the court."

The court found in defendants' favor, ruling "[g]iven the totality of the record" that the plaintiffs did not meet their burden: "I know that's extremely disappointing from plaintiffs' perspective. But I'm just not persuaded that you've shown that it's more likely true than not that the Gonzalez' intended to convey the subject property to defraud creditors generally or the plaintiffs intentionally."

Plaintiffs filed this appeal from the ensuing judgment.

DISCUSSION

I. <em>Legal Principles</em>

The Legislature in the UVTA "permits defrauded creditors to reach property in the hands of a transferee." (*Mejia v. Reed* (2003) 31 Cal.4th 657, 663; see also *Renda v. Nevarez* (2014) 223 Cal.App.4th 1231, 1235; *Aghaian v. Minassian*, *supra*, 59 Cal.App.5th at p. 455.) Under it, "[a] transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation," as relevant here, "with actual intent to hinder, delay or defraud any creditor of

10

the debtor." (§ 3439.04, subd. (a)(1); see also *Filip v. Bucurenciu* (2005) 129 Cal.App.4th 825, 829 (*Filip*) [fraudulent transfer involves " ' "a transfer by the debtor of property to a third person undertaken with the intent to prevent a creditor from reaching that interest to satisfy its claim" ' "].)[5] "In furtherance of the state's 'general policy of protecting creditors from fraudulent transfers, including transfers between spouses,' the UVTA applies to property transfers made pursuant to a marital settlement agreement incorporated into a judgment of dissolution." (*Aghaian*, at p. 455, quoting *Mejia v. Reed*, at p. 668.) It can even apply to a premarital agreement between prospective spouses designating as separate property each spouse's earnings, income and other property acquired during marriage. (*Sturm v. Moyer, supra,* 32 Cal.App.5th at pp. 303, 315.)

The UVTA "anticipates imaginative debtors will employ an array of tactics to evade payment obligations." (*Nagel v. Westen* (2021) 59 Cal.App.5th 740, 749-750.) "[T]o help the trier of fact discern when a debtor

---

[5] "[S]ection 3439.04 provides two methods of establishing a fraudulent transfer. Actual fraud, as defined in subdivision (a)(1), is a transfer made with 'actual intent to hinder, delay or defraud any creditor of the debtor.' Constructive fraud, as defined in subdivision (a)(2), requires a showing that the debtor did not receive 'reasonably equivalent' value for the transfer, and the transfer was made when the debtor '(A) [w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction'; or (B) the debtor '[i]ntended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.' Section 3439.04 is construed to mean a transfer is fraudulent if the provisions of either subdivision (a)(1) or subdivision (a)(2) are satisfied." (*Optional Capital, Inc. v. DAS Corp.* (2014) 222 Cal.App.4th 1388, 1401-1402.) Plaintiffs in their trial brief argued only that the transfer violated subdivision (a)(1) of section 3439.04, not that Armando engaged in constructive fraud.

11

has crossed the often blurry line between legitimate asset protection planning and voidable maneuvering," the law "enumerates eleven characteristics or ' "badges of fraud" '. . . ." (*Id.* at p. 748.) The factors are "nonexclusive," and assist to determine the existence or nonexistence of actual intent to hinder, delay or defraud creditors. (Legis. Com. com, Deering's Ann. Civil Code, § 3439.04.) The factors are: "(1) Whether the transfer or obligation was to an insider. [¶] (2) Whether the debtor retained possession or control of the property transferred after the transfer. [¶] (3) Whether the transfer or obligation was disclosed or concealed. [¶] (4) Whether before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit. [¶] (5) Whether the transfer was of substantially all the debtor's assets. [¶] (6) Whether the debtor absconded. [¶] (7) Whether the debtor removed or concealed assets. [¶] (8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred. [¶] (9) Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred. [¶] (10) Whether the transfer occurred shortly before or shortly after a substantial debt was incurred. [¶] [and] [¶] (11) Whether the debtor transferred the essential assets of the business to a lienor that transferred the assets to an insider of the debtor." (§ 3439.04, subd. (b).)

"None of these factors is determinative, and no minimum or maximum number of factors is required." (*Aghaian v. Minassian, supra,* 59 Cal.App.5th at p. 456; see also *Filip, supra,* 129 Cal.App.4th at p. 834.) In *Filip,* the court explained the factors "do not create a mathematical formula to establish actual intent. There is no minimum number of factors that must be present before the scales tip in favor of finding of actual intent to defraud. This list of

12

factors is meant to provide guidance to the trial court, not compel a finding one way or the other." (*Id.* at p. 834.) "The presence of one or more badges of fraud does not create a presumption of fraud. Rather, it is merely evidence from which an inference of fraudulent intent may be drawn." (Legis. Com. com., Deering's Ann. Civil Code, § 3439.04.)

Ultimately, "[w]hether a conveyance was made with fraudulent intent is a question of fact, and proof often consists of inferences from the circumstances surrounding the transfer." (*Filip*, *supra*, 129 Cal.App.4th at p. 834; see also *Aghaian v. Minassian*, *supra*, 59 Cal.App.5th at p. 455 [whether debtor had the actual intent to hinder, delay, or defraud a creditor is a question of fact]; *Sturm v. Moyer*, *supra*, 32 Cal.App.5th at p. 315 ["Whether the UFTA applies in this (or any) case depends upon whether there was actual or constructive fraud under . . . section 3439.04. That issue is a factual one . . . ."]; *Universal Home Improvement, Inc. v. Robertson* (2020) 51 Cal.App.5th 116, 126 ["The issue of whether a transfer was made with fraudulent intent is a question of fact"]; *Nautilus, Inc. v. Yang* (2017) 11 Cal.App.5th 33, 40; *Annod Corp. v. Hamilton & Samuels* (2002) 100 Cal.App.4th 1286, 1294.) A creditor seeking relief under section 3439.04, subdivision (a) bears the burden of proof by a preponderance of the evidence. (§ 3439.04, subd. (c).)

## II. *Standard of Review*

The parties dispute the relevant standard of review. Plaintiffs say "[w]hether the trial court should have evaluated the badges of fraud using a pure mathematical formula is a question of law that is reviewed de novo." They further argue the relevant facts at trial were undisputed, and that this court must independently review the application of law to undisputed facts. Citing *Universal Home Improvement, Inc. v. Robertson*, *supra*, 51 Cal.App.5th

13

116, they maintain "a trial court's conclusion of whether a transfer is voidable under the UVTA is a question of law reviewed de novo."

For their part, defendants argue based on *In re I.W.* (2009) 180 Cal.App.4th 1517 (disapproved on another ground in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1003, fn. 7) that where the issues on appeal turn on a failure of proof at trial, the question for the reviewing court is "whether the evidence compels a finding in favor of the appellant as a matter of law." Quoting from that case (*In re I.W.,* at p. 1528), they argue "the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " According to defendants, because plaintiffs disregarded this standard and an appellate court must presume the appealed judgment is correct, they have

waived review of the first two issues presented in their opening appellate brief.[6]

We agree independent review is appropriate to assess plaintiffs' arguments challenging the court's analysis of the UVTA fraudulent transfer issue. Plaintiffs' claims both that the court erred by performing a "mathematical calculation" and by considering Marsha's intent in determining whether a fraudulent transfer took place sound in legal error.

However, as set out above and confirmed by plaintiffs' own cited authority, the court's assessment of the requisite intent to hinder, delay or defraud creditors is a factual inquiry. This is so even where the underlying facts are undisputed, as the matter requires drawing inferences from those facts. "[I]t is settled that when conflicting inferences may be drawn from undisputed facts, the reviewing court must accept the inference drawn by the trier of fact so long as it is reasonable." (*Boling v. Public Employment*

---

[6]     Defendants also contend that plaintiffs' opening brief fails to set forth all material evidence on the issues or set forth any prejudice standard, likewise forfeiting their appeal. Plaintiffs respond that undisputed facts, including Armando's admissions, showed Armando transferred the property to Marsha with intent to hinder delay or defraud creditors. They assert defendants do not identify what material facts they supposedly withheld. It is true that where an appellant does not fairly set forth all the evidence, but states only facts favorable to it, this court may treat a sufficiency of the evidence challenge as forfeited. (*Estes v. Eaton Corp.* (2020) 51 Cal.App.5th 636, 650-651; *Pope v. Babick* (2014) 229 Cal.App.4th 1238, 1246.) But plaintiffs do not raise a sufficiency of the evidence challenge here, so we have no basis to apply the principle. As for prejudice, plaintiffs argue they clearly explained the harm caused by the court's error in using a mathematical formula. Specifically, they maintain they showed prejudice by arguing the "undisputed facts so clearly demonstrate that the transfer of the . . . property was a voidable transfer, no court should have ruled in [defendants'] favor." Because we hold below that the plaintiffs have not shown the court erred in conducting its analysis of the UVTA, we need not decide whether plaintiffs demonstrated prejudice.

15

*Relations Board* (2018) 5 Cal.5th 898, 913; *Universal Home Improvement, Inc. v. Robertson, supra,* 51 Cal.App.5th at p. 126.) Thus, even if the court's findings here were based on some undisputed facts, we may affirm them "under the rule of conflicting inferences by which we must indulge all reasonable inferences in favor of the . . . party that prevailed below." (*Husain v. California Pacific Bank* (2021) 61 Cal.App.5th 717, 732 ["where [plaintiff's] essential position is that the facts are undisputed, the conflicting inference rule pertains even if the facts were undisputed"].) In *Universal Home Improvement, Inc. v. Robertson, supra,* 51 Cal.App.5th 116, relied upon by plaintiffs, the appellate court undertook de novo review of a trial court's *conclusions of law.* (*Id.* at pp. 126-127.)[7] *Universal Home Improvement* does not compel us to independently review the issue of fraudulent intent in this case.

### III. *Trial Court's Analysis of the UVTA*

Plaintiffs contend the court erred in its analysis of the UVTA and whether plaintiffs met their burden of proof by (1) considering the badges of fraud as a mathematical formula and (2) focusing on Marsha's intent. As stated, these contentions sound in legal error, so we assess them independently as questions of law. Doing so, however, we reject them.

In considering these claims, we apply the fundamental appellate review standard by which we presume the correctness of the court's judgment and

---

7 Some of those conclusions of law were that the defendant had a right under a Civil Code provision to prefer one creditor (her sister) over other creditors; that the existence of one or more badges of fraud was "not a mathematical formula and [did] not compel a finding one way or another"; that certain case authorities were not effectively overruled by 2004 amendments to the UFTA; a payment did not toll the statute of limitations on one of the defendant's debts to her sister; and other case authorities "remain[ed] good law." (*Universal Home Improvement, Inc. v. Robertson, supra,* 51 Cal.App.5th at pp. 126-127.)

indulge all presumptions to support it. (*Universal Home Improvement, Inc. v. Robertson*, *supra*, 51 Cal.App.5th at p. 125; *LNSU #1, LLC v. Alta Del Mar Coastal Collection Community Association* (2023) 94 Cal.App.5th 1050, 1070.) Under Evidence Code section 664, we further presume the court's official duties are regularly performed; this presumption applies to all actions of trial judges. Under this standard, " '[i]f the invalidity does not appear on the face of the record, it will be presumed that what ought to have been done was not only done but rightly done.' " (*Elena S. v. Kroutik* (2016) 247 Cal.App.4th 570, 575.) The presumption may be dispelled when the record affirmatively shows a failure to apply the requisite standards. (*In re Hare* (2010) 189 Cal.App.4th 1278, 1292 [presumption is rebutted when " 'irregularity is clearly shown' "].)

A. *Asserted Use of Mathematical Formula*

We cannot agree, viewing the entire record and the court's remarks, that they clearly show the court somehow used the badges of fraud as a strict test to determine Armando's fraudulent intent. Contrary to plaintiffs' argument, the court did not "state[ ] that it would view the badges as a mathematical formula." Plaintiffs point to the court's remarks that it wanted to go through all of the 11 badges, and "ultimately, depending on how many of those plaintiff has carried their burden [*sic*][8] will dictate whether or not plaintiff wins or doesn't win [*sic*]." (Emphasis and some capitalization omitted.) They also point to the court's statement, "So, right now, plaintiff is [*sic*] ahead one to nothing."

---

[8] In recounting the court's comment in their opening brief, plaintiffs eliminate the words "their burden" and set out the court's statement as: ". . . ultimately, depending on how many of those plaintiff has carried [ ] will dictate whether or not plaintiff wins or doesn't win." We think it significant that the court referenced the plaintiffs' burden, suggesting it was not necessarily focusing strictly on the 11 factors.

But plaintiffs take these comments in isolation. Plaintiffs and defendants in their respective trial briefs identified the 11 badges of fraud with plaintiffs emphasizing they did not create a mathematical formula to establish actual intent. After the close of evidence, plaintiffs' counsel reminded the court of that same principle, as well as law (*In re Beverly* (Bankr. 9th Cir. 2007) 374 B.R. 221) stating that a court may find intent even absent badges of fraud. The court acknowledged reviewing both trial briefs. We must presume (Evid. Code, § 664) it was well aware of the correct use of the section 3439.04 factors, and did properly use them as merely guidance in determining fraudulent intent. The remarks highlighted by plaintiffs constituted the court's "suggest[ion]" that it and counsel go through each factor, and in assessing them, it recognized that "some of them . . . are at least from the court's perspective, more important than others." Significantly, after the court's statement about what would dictate whether plaintiffs would or would not prevail, it said, "But it really does come down to, from the court's perspective, whether plaintiffs ha[ve] carried their burden." The court also emphasized that in assessing the 11 factors it would not "play [ ] favors one way or the other." After assessing the factors with counsel, it then acknowledged those on which plaintiffs met their burden, and those on which they did not: "So we've gone through the analysis, and plaintiff[s] ha[ve] carried your burden either in whole or in part, by the court's count, on five of those badges, but ha[ve] failed to carry your burden in whole or in part on eight. Now, I understand that totals more than 11, but in part, there were a couple of badges that plaintiff[s] prevailed and part on a couple of those same badges plaintiff[s] did not prevail. So the total number of that accounted for either side exceeds 11."

18

The parties then presented arguments, during which defendants' counsel addressed "the overall situation." In reaching its decision in defendants' favor, the court relied more broadly on evidence concerning Marsha and Armando's marital situation, the circumstances surrounding their entry into the marital settlement agreement, and expressly, the "totality of the record . . . ."

A court does not err in conducting an analysis of the relevant factors by addressed each as contemplated by the Legislature, as the trial court did here. It is evident in this case that the court did not end its analysis there; it weighed consideration of the factors with other evidence surrounding the parties' marital settlement agreement, and ultimately considered the entirety of the record to determine whether plaintiffs met their burden to show a fraudulent transfer. Under the circumstances, we do not view the isolated remarks highlighted by plaintiffs as a showing of clear irregularity (*In re Hare*, *supra*, 189 Cal.App.4th at p. 1292) so as to rebut the presumption that the trial court correctly used the section 3439.04 factors not as a strict formula dictating the outcome, but to simply assist it in drawing inferences as to the existence or nonexistence of the requisite intent.

B. *Court's Reliance on Marsha's Intent*

Plaintiffs contend the trial court improperly reached its decision by "nearly exclusively" focusing on Marsha's intent rather than Armando's, as well as other "irrelevant" factors such as Marsha's use of her divorce attorney

to effect the property's transfer.[9]  They assert the court's analysis was contrary to section 3439.04, subdivision (a), which requires a showing of the transferor's, not the transferee's, intent to hinder, delay or defraud a creditor, as well as *Mejia v. Reed*, *supra*, 31 Cal.4th 657.  Plaintiffs highlight the California Supreme Court's statement in *Mejia* that "it is unlikely that the Legislature intended to grant married couples a one-time-only opportunity to defraud creditors by including the fraudulent transfer in [a marital settlement agreement]." (*Mejia*, at p. 668.)  They argue, "While Marsha was certainly free to divorce Armando, the law does not allow her to take all of the community property in that divorce and leave Armando's creditors with no way to recover any portion of their debts.  Doing so is a fraudulent transfer."

The merits of the plaintiffs' claim of actual fraud so as to void a marital settlement agreement under the former UFTA was not at issue in *Mejia v. Reed*, *supra*, 31 Cal.4th 657.  *Mejia* held generally the law applies to transfers under marital settlement agreements. (*Id.* at pp. 661, 663.)  *Mejia* as well as *Sturm v. Moyer*, *supra*, 32 Cal.App.5th 299 do hold that the UVTA *can* apply to marital settlement agreements or premarital agreements, but that "does not mean that it necessarily *will* apply to invalidate the agreement . . . ." (*Sturm*, at p. 315.)  That question, as discussed above, depends on proof of actual (or constructive) fraud under section 3439.04, a factual issue for the court (*ibid*), which must reach its finding guided but not

---

9    In making these arguments, plaintiffs characterize Armando's intent as "plain and obvious given the circumstances of the transfer and the existence of *all* relevant badges of fraud . . . ."  As indicated below, the record contains direct evidence of Armando's intent.  But even if that evidence must be weighed against the badges of fraud, that issue was subject to the rule of conflicting inferences, and here, the court drew a contrary inference supporting defendants' position that there was an absence of intent.  We conclude below that its decision in that respect was a reasonable one.

compelled by any particular section 3439.04, subdivision (b) factor. (*Aghaian v. Minassian, supra,* 59 Cal.App.5th at p. 456.)

While it is true that the UVTA requires proof of the relevant intent on the transferor's part, that does not mean a court's analysis is as narrow or circumscribed as plaintiffs suggest. Intent is often proven by circumstantial evidence (see *Sosa v. Cashcall, Inc.* (2020) 49 Cal.App.5th 42, 51), and in our view, the transferor's state of mind may be inferred from not *only* that person's statements or acts, but from other evidence including the transferee's statements and actions, particularly where the transfer at issue is effected by a marital settlement agreement between spouses. We see no reason why the trial court here could not draw inferences about Armando's intent from Marsha's actions and decisions, combined with the other evidence in the record before it.

But here, we see no clear indication in the record that the court limited its consideration to, or overly focused upon, Marsha's intent. Indeed, the trial court's conclusion necessarily encompassed Armando's intent: it ruled plaintiffs had not proven by a preponderance of evidence that *both parties* intended to convey the property to hinder or defraud them specifically or creditors generally. In reaching its conclusion, the court considered the entire record, which contains direct evidence of Armando's intent in entering into the marital settlement agreement. Armando's testimony in that respect was that the possibility of future civil damages against him was not a consideration; by entering into the marital settlement agreement he sought to eliminate his debt, not to transfer the property out of the reach of creditors. In Armando's view, the quitclaim and transfer was simply part of his and Marsha's divorce settlement. The court accounted for the reasons why both parties entered into the marital settlement agreement, and the fact

21

it was prompted not by Armando, but by Marsha's decision to divorce him after the deterioration of their marriage, which according to both parties began before Armando's March 2015 arrest. It found: "[I]t appears to me that from [Marsha's] perspective, the marriage was collapsing, if not had collapsed, well before the criminal proceedings were instigated, looks to me, like going back to at least [20]13." The evidence showed that Marsha initiated divorce proceedings and the parties signed the marital settlement agreement before plaintiffs filed their civil suit and obtained their judgments against Armando, permitting a reasonable inference that the marital settlement agreement and quitclaim was not motivated by the possibility of a civil judgment against Armando, or the intent to delay, hinder or defraud potential creditors.

In sum, the record does not clearly demonstrate any irregularity; the court did not reach a decision based solely or mostly on Marsha's intent to the exclusion of evidence of Armando's intent. We reject plaintiffs' argument that it erred as a matter of law in this respect.

IV. *Ruling on Plaintiffs' Burden of Proof*

Plaintiffs contend the court erred in its various rulings as to the badges of fraud, as well as by concluding they did not meet their burden of proof. Specifically, they maintain only seven of the 11 badges of fraud were relevant and all seven were supported by the undisputed evidence. According to plaintiffs, on those seven badges, either the trial court found in their favor or it clearly erred by not finding in their favor. Plaintiffs further complain that even though the trial court found they carried their burden to prove the existence of five badges of fraud, it nevertheless ruled in defendants' favor, which they say is "unprecedented" and "makes no sense." Plaintiffs suggest that Armando's uncontroverted admissions to certain circumstances about

22

the property transfer's timing and impact on him, the consideration given, and his continued residence at the property, should have compelled the trial court to find a "textbook" fraudulent transfer. They say "[t]he trial court's failure to find in [their] favor, even after finding that [they] carried their burden on five badges of fraud, compels reversal of the judgment and entry of judgment in [their] favor . . . ." (Capitalization omitted.)

This latter argument seems to us to advocate the very mathematical formulaic approach that plaintiffs assert is improper. The presence of one or more badges of fraud, or even all of the badges of fraud, is not outcome determinative; such evidence merely guides the court in reaching its ultimate conclusion as to the requisite intent to delay, hinder or defraud creditors such that a fraudulent transfer has taken place. They do not compel an outcome one way or the other. We will not reverse the judgment based simply on the fact the court found evidence demonstrating the existence of some or even most of the applicable badges of fraud.

We have already rejected plaintiffs' position that our review of the court's decision is de novo because the relevant facts are assertedly undisputed. As indicated above, the question of intent is typically reached by drawing inferences from the evidence, even uncontroverted evidence. (*Universal Home Improvement, Inc. v. Robertson*, *supra*, 51 Cal.App.5th at p. 126.) Where the evidence gives rise to conflicting inferences, we must defer to the trial court's choice as long as it is reasonable. (*Ibid*.; see *Milton v. Perceptual Develop. Corp.* (1997) 53 Cal.App.4th 861, 867.) We also defer to the court's credibility determinations (*Duran v. U.S. Bank National Assn.* (2014) 59 Cal.4th 1, 49) and must accept them unless the testimony is incredible on its face, inherently improbable, or wholly unacceptable to

23

reasonable minds.  (*Nevarez v. Tonna* (2014) 227 Cal.App.4th 774, 786.) None of Armando or Marsha's testimony falls into that narrow exception.

The trial court drew inferences and credited the parties' testimony that they were not motivated in reaching their marital settlement by the potential for a civil judgment against Armando.  Given the evidence outlined above, particularly as to Armando's intent in entering into the marital settlement agreement and the circumstances surrounding his transfer of the property to Marsha, the court's ruling was a reasonable one.  We decline to reweigh the factors pertinent to a finding of fraudulent transfer or the witnesses' credibility and reach a determination contrary to the court's express and implied credibility findings.  Our inquiry ends with the determination that Marsha's and Armando's testimony was not incredible on its face, inherently improbable, or wholly unacceptable to reasonable minds.

## DISPOSITION

The judgment is affirmed.


O'ROURKE, Acting P. J.

WE CONCUR:


DO, J.


CASTILLO, J.